1
2
3
4
5
6
7
8
9
UNITED STATES DISTRICT COURT

10
FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12   LONNIE DAVID STRINGER,                    No.  2:09-cv-2980-KJM-EFB P

13                    Petitioner,

14          v.

15   JOHN MARSHALL,                            FINDINGS AND RECOMMENDATIONS

16                    Respondent.

17

18          Petitioner is a state prisoner with counsel seeking a writ of habeas corpus.  *See* 28 U.S.C.

19   § 2254.  On March 31, 2011, this court granted respondent's motion to dismiss the action as

20   barred by the statute of limitations contained in the Anti-terrorism and Effective Death Penalty

21   Act ("AEDPA").  ECF No. 30.  Thereafter, petitioner filed a Notice of Appeal.  Later that year

22   while the appeal was pending, the United States Court of Appeals for the Ninth Circuit concluded

23   in another case that AEDPA's limitations provisions are subject to an equitable exception for

24   claims of actual innocence.  *Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011) (*en banc*).  The United

25   States Supreme Court agreed in 2013.  *McQuiggin v. Perkins*, 569 U.S. 383, 386-87 (2013).

26   /////

27   /////

28
1

On the appeal in this matter, the Ninth Circuit affirmed this court's determinations that: (1) petitioner is not entitled to statutory tolling; (2) the federal statute of limitations began to run when petitioner's conviction became final; and (3) petitioner is not entitled to equitable tolling. ECF No. 38.  However, because this court did not consider whether petitioner qualified for the equitable exception based on actual innocence, the Ninth Circuit remanded the case for consideration of that single issue, citing *McQuiggin*. *Id.*

On remand, this court ordered supplemental briefing and the filing of the state court record to address the actual innocence issue.  ECF No. 40.  The court then, at petitioner's request, stayed the case pending the outcome of DNA testing ordered by the state court.  ECF No. 60. The court lifted the stay on July 16, 2019 and ordered petitioner to file "a supplemental brief that includes all arguments he wishes to raise regarding the application of the equitable exception for claims of actual innocence to his case."  ECF No. 89 at 2.  The court cautioned petitioner that the supplemental brief would supersede petitioner's prior supplemental brief (ECF No. 45). *Id.*  The court has received petitioner's second supplemental brief, respondent's opposition, and petitioner's reply.  ECF Nos. 90-92.  Having carefully reviewed these briefs and the state court record, the undersigned again recommends that the motion to dismiss be granted, as petitioner has failed to make the high showing required to qualify for the innocence exception.

## I.      Background

In 1996, petitioner was convicted of second-degree murder in the death of his wife, Cynthia Stringer.  ECF No. 52 (Notice of Lodging Document in Paper), Ex. 1, Clerk's Trial Record (hereinafter "CT") at 272.  Evidence at the trial attested to the following facts:

At around 9:30 on the morning of April 28, 1995, Cynthia's coworkers at Kaiser Hospice learned that she had not shown up for a 9 a.m. home care appointment with patient Marion Coleman.  ECF No. 52, Ex. 5, Reporter's Trial Transcript (hereinafter "RT") at 128-31, 139-40, 147.  They called Cynthia at home but received a busy signal. *Id.* at 133.  They paged her but did not get a call back. *Id.* at 144-45.  Cynthia's coworker Larry Miller called the phone company operator somewhere between around 9:30 to 10 a.m. to attempt to break through the line. *Id.* at

147-48, 145, 151.  The operator told Miller that she could not break through because the phone was off the hook.  *Id.* at 145, 151-52.  Miller and another coworker, Phyllis Alexander, then drove to Cynthia's home on Boggs Court.  *Id.* at 140-41, 151.  When they arrived at around 10:15 a.m., the home had been cordoned off by police.  *Id.*

Phone records revealed that a one-minute call had been placed from the Stringer home to the Coleman home on the Wednesday before the murder at 8:56 a.m., but no call to the Coleman home had been placed on the morning of the murder.  *Id.* at 646.  Elaine Pavlatos, receptionist to Cynthia's dentist, testified that she had called the Stringer home on the morning of the murder sometime between 9:30 and 10:15 and left a message on the answering machine to remind Cynthia of an upcoming appointment.  *Id.* at 890-91.  James Gill, a friend of petitioner's, testified that he left a message on the Stringer's phone at around 8:55 a.m. the morning of the murder, but no such message existed on the phone's tape when later retrieved by police.  *Id.* at 910-12.  Patrick Garrett, petitioner's brother-in-law, witnessed Gill make a call at that time, but testimony of other witnesses cast some doubt as to whether Gill actually called the Stringer home.  *Id.* at 963, 1053-54.

Cynthia's coworkers described her as extraordinarily punctual and very well-liked.  *Id.* at 136-37, 142-43, 148, 152-54.

Richard Niles and his wife, Lauren, were friends with petitioner and Cynthia and the two couples often socialized together.  *Id.* at 252-53, 266.  A few days before Cynthia's murder, Richard loaned petitioner $1000, which petitioner said he would use to pay for truck driving school.  *Id.* at 253-55.  The Niles regarded petitioner as non-violent and had never witnessed petitioner act violently toward Cynthia.  *Id.* at 898-900.  Other friends and relatives also testified that petitioner was not violent and that they had seen no indication that he had been violent toward Cynthia.  *Id.* at 610-11, 906-07, 915, 927, 943, 960, 974, 990.

Cynthia attended bible study with her niece, Mary Lee, and Lauren Niles the night before her murder.  *Id.* at 253, 266.  Cynthia and Lauren returned to the Niles home around 9 p.m. after dropping Mary Lee back home.  *Id.* at 266, 268.  Cynthia changed her clothes using some she had

1   brought in a plastic bag.  *Id.* at 268, 270.  Petitioner arrived around 12:20 a.m.  *Id.* at 267.

2   Cynthia's car, which had been parked in the driveway, had a flat tire.  *Id.* at 268, 271.  Lauren

3   assumed that petitioner fixed the flat tire, as Cynthia and petitioner both left at around 12:35 a.m.

4   *Id.* at 268.

5           Michael Darling was the admissions director for Western Truck School in Sacramento.

6   *Id.* at 544.  Petitioner was a student at the school, with his first day of attendance being April 24,

7   1995.  *Id.* at 545.  He attended on April 24th and 25th, was absent on the 26th and 27th, and was

8   dropped from the school on the 28th.  *Id.* at 546-47.  He did not pay any tuition to the school.  *Id.*

9   at 546.  James Hartley was an instructor at the truck school.  *Id.* at 555.  He confirmed that

10  petitioner attended for two days, was absent for two days, and then was dropped during the week

11  of April 24, 1995.  *Id.* at 555-56.

12          Doris Price lived directly across the street from the Stringer house on April 28, 1995.  *Id.*

13  at 237.  She left her house early that morning to buy fish with a friend, but returned to her house

14  shortly after leaving because she had forgotten her purse.  *Id.*  When she left, she noticed no

15  activity on the street.  *Id.* at 237-38.  When she returned, she saw petitioner standing in his

16  driveway.  *Id.* at 239-40.  There were no police present.  *Id.* at 241.  Price estimated the time as

17  between 10 and 10:15 a.m.  *Id.*  Petitioner said, "Hi," to Price and she replied, "Hi.  Don't the

18  yard look nice?" as she went in her house.  *Id.* at 240.  Price had tried to be a friendly neighbor on

19  the street and speak to everybody, but petitioner had never spoken to her before that day.  *Id.* at

20  241.

21          Solita Gaspar lived on Boggs Court on the day of the murder.  *Id.* at 308.  She left just

22  before 10 a.m. that morning to go shopping at Mervyn's.  *Id.*  She saw nothing unusual, and had

23  heard nothing unusual in the morning before leaving.  *Id.* at 309.  She saw Cynthia's car but not

24  petitioner's red truck at the Stringer house.  *Id.* at 311-12.  When she returned before noon, police

25  and a crowd were in front of the Stringer house.  *Id.* at 309-10.  Gaspar would usually see Cynthia

26  in the mornings around 8 to 8:15 a.m. when Gaspar left to take her granddaughter to school.  *Id.*

27  at 310-11.

28                                                      4

1   Michael Tobey went to Boggs Court on the morning of the murder to give Mike Boes an

2   estimate on two bathroom remodels.  *Id.* at 937.  He arrived at 9:10 a.m., saw nothing unusual in

3   the neighborhood, and found Boes at his kitchen table, in front of a window facing the street.  *Id.*

4   at 937-38.  When he left at 9:50 a.m., Tobey saw nothing unusual.  *Id.* at 938.

5   Boes saw petitioner driving his red truck away from the Stringer home around 8:45 a.m.

6   that morning.  *Id.* at 941.  He saw petitioner return in the truck around 10 a.m. from his kitchen

7   window.  *Id.*  He had been looking out the window continuously from around 8:45 to 9:10 and

8   had seen no pedestrians or any unusual activity.  *Id.* at 944.  He could not recall seeing any other

9   vehicles.  *Id.*  He returned to his seat before the kitchen window after looking at the bathrooms

10  with Tobey sometime before 10 a.m., looked out the window and again saw nothing unusual.  *Id.*

11  at 944-45.  A short time later, police arrived.  *Id.* at 942.  Boes saw petitioner being escorted to a

12  police car, looking like he was very upset and in shock.  *Id.* at 943.

13  Elvira Rutter lived next door to the Stringers.  *Id.* at 503.  Her house had many skylights,

14  so she could hear loud noises outside from within the house.  *Id.* at 503-04.  On the morning of

15  the murder, she was at home with her daughter and husband, who was getting ready for a 10 a.m.

16  appointment.  *Id.* at 504.  Ms. Rutter could not remember whether it was before or after her

17  husband left for the appointment, but at some point petitioner came to her screen door, frantic,

18  yelling for her to call 911 and running back to his house.  *Id.* at 504-09.  She called 911.  *Id.* at

19  509.

20  Philip Silva was a Vallejo police officer.  *Id.* at 394.  He was working on the morning of

21  April 28, 1995 and received a radio instruction to go to the Stringer home because a woman was

22  bleeding from the head.  *Id.* at 394-95.  He arrived shortly after being dispatched, along with

23  Officer Ben Townsend, who he was training.  *Id.*  He could hear a male voice inside the

24  residence, yelling.  *Id.* at 396.  He opened a "security-like" screen door and entered the house (the

25  front door was open).  *Id.*  Silva and Townsend went to where the voice was coming from.  *Id.*

26  He found petitioner lying on top of what appeared to be kitchen rugs.  *Id.*  Petitioner was holding

27  the phone and yelling for someone to "help her."  *Id.*  Silva took the phone from petitioner and

28

5

1  placed the receiver on the counter without hanging it up.  *Id.* at 408, 991.  Petitioner had some

2  blood on his face and hands and a little bit of blood on his clothes.  *Id.* at 413.  Silva grabbed

3  petitioner and handed him to Townsend.  *Id.* at 412.

4       Under the rugs, he discovered the body of a woman.  *Id.* at 397.  The rugs had covered her

5  all the way up over her face.  *Id.* at 413-14.  He checked to see if she was breathing or had a

6  pulse, but found neither.  *Id.* at 397.  Silva saw a large wound on her head.  *Id.*  She was covered

7  in blood from her head down her body.  *Id.*  There was a large pool of blood on the floor and a lot

8  of blood on the counters.  *Id.*  The blood was coagulating, "chunky," "clumping," and "wet."  *Id.*

9  at 402, 439.  Cynthia's skin was very cool to the touch and ashy-grey.  *Id.* at 398.  A hard, foamy,

10  bloody substance was in her mouth.  *Id.*  No blood flowed from her wound.  *Id.* at 439.  He

11  checked her arm for rigor mortis but felt none; her body was limp.  *Id.* at 398.  Later, after

12  sundown, the coroner arrived.  *Id.* at 425.  The coroner checked for rigor mortis, and Silva

13  believed found none present.  *Id.*

14       The house was very well-kept, and Silva saw no signs of forced entry or ransacking after

15  checking every room and all windows and doors.  *Id.* at 398-99.  He found no possible "clubbing

16  instruments."  *Id.* at 399.  Along with Townsend and another officer, Jensen, Silva secured the

17  residence.  *Id.*  They maintained security throughout the day for the detectives.  *Id.*   Silva left the

18  Stringer home shortly after midnight.  *Id.*

19       Silva touched the hoods of the vehicles at the house when he arrived.  *Id.* at 414-15.

20  Cynthia's car was cool, and petitioner's truck was warm, indicating that it had been recently

21  driven.  *Id.*  Silva found no bloody clothing or murder weapon in the house or truck.  *Id.* at 434-

22  35.  He saw no blood in the house, outside of the crime scene in the kitchen.  *Id.* at 435-36.

23       Silva did not take care not to step in the pool of blood when he first arrived, as his first

24  concern was Cynthia's welfare.  *Id.* at 402-03.

25       Officer Townsend testified that the house appeared clean when he and Silva arrived at

26  around 10:10 or 10:15 a.m.  *Id.* at 443, 445.  Petitioner was very upset, distraught, and crying.  *Id.*

27  at 978.  Silva grabbed petitioner and pulled him off the body.  *Id.* at 482.  Townsend then

28  6

removed petitioner from the kitchen and had him sit on the couch in the living room.  *Id.* at 444.
He then took petitioner to the patio, where petitioner said "it's my fault," or words to that effect.
*Id.* at 444, 482.  Townsend asked petitioner what happened, and petitioner told him he had gone
to the donut shop, then a family member's house, and returned home.  *Id.*  He, along with an
Officer Lawson, escorted petitioner to a police patrol car and placed him in the back seat.  *Id.* at
461-62.  He helped secure the area with Officer Silva through the day until about 1 a.m.  *Id.* at
444-45.  He dusted parts of Cynthia's car for prints but did not find any.  *Id.* at 454.  Late that
night, as the body was being removed from the scene, Townsend touched the body to see what
rigor mortis was like, but he did not detect any stiffness.  *Id.* at 476.

Detective Matthew Meredith testified that he arrived at the Stringer home at around 10:30
on the morning of the murder.  *Id.* at 810.  He and his partner went into the house, which
appeared neat.  *Id.* at 810-11.  Later that morning, he interviewed and photographed petitioner at
the police station and took various items of clothing and jewelry from him as evidence, which he
later provided to criminalist Faye Springer.  *Id.* at 811-12.  Meredith did not notice any marks on
petitioner's body indicating that he had been in a struggle.  *Id.* at 856.  In the evening, he obtained
a blood sample from petitioner that he also provided to Springer.  *Id.* at 813.

Detective Meredith's interview with petitioner lasted four to five hours.  *Id.* at 814.
Petitioner told him that he had attended trucking school the previous day from 4 p.m. to midnight
and then went to the Niles's home to pick up Cynthia.  *Id.* at 815-16.  Petitioner told Meredith
that that morning Cynthia was running late for work.  *Id.* at 816.  She was still at home when
petitioner left the house at around 8:50 a.m. to run errands.  *Id.* at 818.  He first drove to an
animal shelter to look for a dog, but it was closed.  *Id.*  He next went to a donut shop for some
food.  *Id.* at 819-20.  After ordering, he realized he had no money.  *Id.* at 820.  The owners gave
him the food (a donut for himself and a muffin for Cynthia) on credit and he left.  *Id.*  Petitioner
told Meredith that he then went to the sign company where his brother-in-law, Pat Garrett,
worked.  *Id.*  He spoke with Garrett for around 10 minutes and then drove to his mother's house.
*Id.* at 820-21, 869.  He went in the house and then left to return home.  *Id.* at 821.

7

Once at the house on Boggs Court, petitioner told Detective Meredith, he retrieved his dog from the backyard and tied him up in the back of petitioner's truck. *Id.* He had a brief conversation with his across-the-street neighbor and then went in the house. *Id.* Once inside, petitioner looked for Cynthia in the bedroom and then walked into the kitchen and found her. *Id.* at 821-22. He shook her and then ran out of the house to a neighbor to get help. *Id.* at 822. He then returned home and called police from the kitchen. *Id.* at 822-23. While waiting for police, petitioner told Meredith that he held and shook his wife. *Id.* at 823.

At some point in the interview, petitioner told Detective Meredith that he had actually gone gambling the previous night (rather than to trucking school, as he had previously said and as he had told his wife). *Id.* at 824. At the casino, he lost the $1000 he had borrowed from Mr. Niles. *Id.* at 824-25. He expected that Cynthia would be angry to learn of the loss, because he was unemployed and the couple had money problems. *Id.* at 825. He had not planned to tell her about it until the weekend. *Id.*

During the questioning, Meredith lied to petitioner as an interrogation tactic. *Id.* at 840. He told petitioner a number of times that the Department of Justice had a "high-speed spray" on petitioner or his clothes that linked him to the murder. *Id.* Nevertheless, petitioner never admitted to having murdered his wife. *Id.* at 850. He gave consent to have his house and vehicles searched. *Id.* at 851.

During the trial, Detective Meredith drove the route through Vallejo that petitioner told him he took the morning of the murder. *Id.* at 1041. He went from the Stringer home to the animal shelter, then to the donut shop, on to the sign shop and then petitioner's mother's house, and back to Boggs Court. *Id.* at 1041-42. At each location, he stopped only long enough to record his mileage. *Id.* He drove the route around noon, and traffic was normal. *Id.* at 1041. The trip was 10.2 miles and took 29 minutes. *Id.* Detective Meredith believed traffic would be a bit lighter earlier in the morning. *Id.* at 1048.

Detective Bennigson, of the Vallejo Police Department, arrived at the crime scene at about 10:36 on the morning of the murder. *Id.* at 513, 517. He looked around the house for signs of

8

forced entry, but found none.  *Id.* at 514-15.  The house was neat and clean with no evidence of ransacking.  *Id.* at 515.  He found no weapons in the home.  *Id.*  Cynthia's body was in a sitting position in the kitchen with her head leaning forward.  *Id.* at 525.  She had an obvious head wound, and there was a lot of blood on the lower, left-hand side of her.  *Id.*  Blood was spattered behind her on the cabinets and ceiling and a washer and dryer nearby.  *Id.* at 525-26.  Red foam that was not moving and appeared hard came from her mouth.  *Id.* at 526.  Bennigson took some photos.  *Id.*  He recalled that someone seized the tape from the house's answering machine as evidence.  *Id.* at 520.  The body was removed around 9 p.m.  *Id.* at 536.

Bennigson observed the autopsy of Cynthia's body and transported the rape kit, clothing, fingernail clippings, and blood sample to the police department evidence room.  *Id.* at 515-16.  Another detective later transported the rape kit, clothing, and sample of Cynthia's blood to Caroline Garcia at the Department of Justice.  *Id.* at 516.

Caroline Garcia, a criminalist for the California Department of Justice, testified as an expert for the prosecution.  *Id.* at 759-60.  She participated in the analysis of the crime scene on the day of Cynthia's murder and authored the field investigation report for the case.  *Id.* at 760.  She examined the inside and outside of petitioner's truck and the outside of Cynthia's car.  *Id.* at 760-61.  She found no blood on the truck.  *Id.* at 761.  She found no blood or shoeprints in the carport.  *Id.*  She took a number of items from the home back to the Department of Justice lab.  *Id.*  From the front door, Garcia took what appeared to be a blood stain on the metal base of the doorway as well as a "control" (an area near the apparent blood stain where no stain appears).  *Id.* at 761-62.  From the entranceway, she took photos of what appeared to be shoeprints.  *Id*. at 762.  She examined the house for signs of forced entry and found none.  *Id.*  Aside from the kitchen, the house was neat and orderly.  *Id.* at 763.  Garcia saw no signs of a struggle or ransacking.  *Id.*  She noted that Cynthia's purse looked as if it had not been gone through, like nothing was missing.  *Id.*  She collected numerous items from the living room and kitchen, including "lifts" from Cynthia's body (using tape to lift trace evidence).  *Id.* at 764-66.  She obtained blood samples for Cynthia and petitioner, showing that Cynthia was type B and petitioner was type O.

1  *Id.* at 766-67.

2      Faye Springer was Garcia's partner at the Department of Justice. *Id.* at 156. She testified

3  as an expert for the prosecution. *Id.* She processed the crime scene on April 28, 1995 with

4  Garcia. *Id.* at 159. They arrived in late afternoon, after waiting for a search warrant to be signed.

5  *Id.* Detective Meredith gave them petitioner's blood sample, clothing, watch, wedding ring, and

6  shoes. *Id.* at 160. A detective Bartlett later provided Cynthia's blood sample, clothing, fingernail

7  clippings, and sexual assault kit. *Id.* at 161. She tested the items in the sexual assault kit for

8  seminal fluid and found none. *Id.* at 162. Springer examined petitioner's clothes. *Id.* at 163.

9  The clothes had blood smears and soaking type blood stains. *Id.* Petitioner's sweatshirt had no

10  blood spatters. *Id.* at 165.

11      Based on the spatter around Cynthia's body, Springer opined that she had been

12  bludgeoned in the kitchen. *Id.* at 168. She saw no signs of struggle. *Id.* She opined that Cynthia

13  was standing when she was first struck, because of the arterial spurting spatter on the upper

14  cabinets and ceiling. *Id.* at 169. Spatter on the lower cabinets indicated that she was attacked

15  with additional blows once she slumped from the initial blows. *Id.* at 180.

16      Springer did not believe that the sweatshirt police took from petitioner was worn by

17  Cynthia's assailant, unless it had been shielded in some way, because it lacked the type of blood

18  spattering found around her body. *Id.* The blood smears on the sweatshirt were consistent with

19  petitioner leaning over the body. *Id.* The smearing, soaking, and droplet patterns on petitioner's

20  pants were also not of a type that Springer would expect on the assailant. *Id.* at 172. Instead, she

21  would have expected blood spatters on the upper part of the pants. *Id.* The blood stains on

22  petitioner's shoes could have come from the assault but also could have come from petitioner's

23  interaction with the body after death. *Id.* at 173.

24      Springer found two towels with a small amount of blood on them inside the Stringer

25  washing machine. *Id.* at 174. Two stains from the towels were tested; one was inconclusive and

26  the other tested as type B human blood. *Id.* She also found some blood stains trailing from the

27  kitchen into the living room and on the arm rest of the living room couch, which could have come

28                                   10

1    from police leading petitioner from the kitchen into the living room.  *Id.* at 175.

2         Springer described four shoe prints found at the scene.  *Id.* at 184.  One she believed came

3    from Officer Silva's shoes.  *Id.*  Another had a "vibrum" sole, which could be found on many

4    shoes but was associated with work boots.  *Id.*  Some of the firemen on the scene had such work

5    boots on.  *Id.*  A third pattern was similar to petitioner's shoes, and a fourth pattern did not match

6    anything Springer had, after photographing the soles of all the individuals who had worked at the

7    scene.  *Id.* at 184-85.  She did not know where the fourth shoe print came from.  *Id.* at 184.  The

8    prints were all partial, and Springer could not be absolutely sure that they came from shoes.  *Id.* at

9    184-85.  She would expect the assailant to have blood spatter on his front, arms, hands,

10   particularly from the waist to the head.  *Id.* at 225.

11        Springer found no blood on petitioner's truck, inside or outside.  *Id.* at 187.  She found no

12   blood or shoeprints in the carport, either.  *Id.*  No blood was found on the gate, in the bedrooms,

13   or in the bathrooms.  *Id.*at 194-95.

14        Latent fingerprint analyst Tom Crosby testified as an expert for the prosecution.  *Id.* at

15   698-99.  He examined the crime scene for fingerprint evidence on April 28, 1995, including most

16   of the residence and the outside of Cynthia's Toyota.  *Id.* at 699-700.  He concentrated on the

17   kitchen and living room.  *Id.*  Crosby did not take any lifts off the small, wood, walk-through gate

18   outside the home's entrance, the metal grate at the entrance, or the door that went into the

19   backyard area.  *Id.* at 719-20.  He did examine the doors, but believed he found nothing to process

20   on them.  *Id.* at 720-22.  He found latent fingerprints on the phone in the living room, some

21   kitchen cabinets, the phone in the kitchen, a coffee table in the living room, a picture frame in the

22   living room, and the car.  *Id.* at 701.  He also examined various items given to him by the

23   Department of Justice for analysis and found latent prints.  *Id.* at 704-05.

24        Crosby submitted some of those latent prints, which he could not identify, to Automated

25   Latent Print System for comparison with a database of prints.  *Id.* at 705-10.  That system did not

26   identify the prints.  *Id.* at 747.  The unidentified prints were lifted from the kitchen cabinet above

27   the microwave, the living room frame, the front fender of Cynthia's car, and two coupons.  *Id.* at

28

1   730-41.  Crosby did not attempt to match them because he was not provided prints for

2   comparison for anyone other than petitioner.  *Id.* at 741, 747.  Crosby identified 48 of the latent

3   prints, found on 19 items, as matching petitioner.  *Id.* at 711-13.

4       Crosby testified that prints could last a long time on an undisturbed surface, depending on

5   a host of environmental factors and the type of surface.  *Id.* at 741-43.  It is virtually impossible to

6   determine when a print was placed on a surface.  *Id.* at 746.  It is possible to touch a surface

7   without leaving a print, even if the surface is conducive to prints.  *Id.* at 743.

8       Forensic pathologist Dr. Arnold Josselson testified as an expert for the prosecution.  *Id.* at

9   670-72.  He performed an autopsy on Cynthia's body at 1:45 p.m. on April 29, 1995 (the day

10  after the murder).  *Id.* at 672.  He concluded that she had died from blunt force injuries to the

11  head.  *Id.* at 673.  He could not determine the kind of blunt instrument used to bludgeon Cynthia

12  nor the height and weight of her attacker.  *Id.* at 684, 694.  He described her head injuries in

13  detail, but could not determine whether she had been hit from the front or behind.  *Id.* at 673-77,

14  684.  He examined the body for other injuries but did not find any, other than a small bruise on

15  the face.  *Id.* at 677, 684.  She was wearing jewelry and her pager when she died.  *Id.* at 678.  He

16  was familiar with the phenomenon of rigor mortis and described it as a chemical reaction in

17  muscles after death that makes them contract and feel stiff to the touch.  *Id.* at 679-81.  The

18  stiffness begins two to four hours after death, becomes complete between six and 12 hours after

19  death, starts to disappear after 24 hours, and is usually completely gone after 36 hours.  *Id.* at 679.

20  Those numbers were not absolute, however, as factors such as the condition of the decedent prior

21  to death and the environment could speed or slow the process.  *Id.* at 679-80, 686.  If rigor mortis

22  set in to Cynthia's body at some time after 10:15 a.m. on the morning of her death, it should have

23  also been present at 7:30 p.m. the same day.  *Id.* at 689.  Josselson made no attempt to determine

24  the time of Cynthia's death.  *Id.* at 693.  He noted no factors in Cynthia or in the environment in

25  which her body was found that would alter the usual timeframe for rigor mortis.  *Id.* at 695.

26      Josselson also described algor mortis as the cooling of a body after death.  *Id.* at 681.  He

27  testified that, in the first hour after death, the temperature of a body increases a little bit.  *Id.*

28

1    After that, the temperature generally decreases at a rate of 1.5 degrees Fahrenheit per hour,

2    subject to variations caused by factors such as the condition of the decedent prior to death and the

3    environment. *Id.* Extremities begin to cool immediately upon death. *Id.* at 694. To get a proper

4    measure of the temperature of the body, a person would have to use some method other than just

5    touching an extremity, because the temperature sensed by touching an extremity would be

6    influenced by the temperature of the person touching and other factors. *Id.* at 692-93.

7         Dr. Paul Hermann was called by the defense as an expert in forensic pathology. *Id.* at

8    994-97. Generally, he said, rigor mortis sets in about two to four hours after death, but the time

9    can vary widely. *Id.* at 998. The stiffness then remains for about 36-48 hours and then

10   disappears, although that time can vary widely as well. *Id.* at 998-99. Hermann was certain that

11   Cynthia's body could not have gone through the entire rigor mortis cycle (from stiff back to soft)

12   in the time between her departure from the Niles' home and the discovery of her body. *Id.* at 999-

13   1000. He testified further that, if the body was undergoing rigor mortis at 8:30 p.m. on the date of

14   the murder, it was also certainly in rigor mortis at 7:30 p.m. *Id.* at 1000. It was possible that

15   Cynthia died between 8:50 a.m. and 10:15 a.m. that morning, but also possible that the death

16   occurred between 7:50 and 8:50. *Id.* at 1001, 1009. The fact that Officer Silva thought Cynthia's

17   hand was cold upon discovering her body was not particularly probative of her time of death and

18   not inconsistent with her having died between 8:50 and 10:15. *Id.* at 1001-03.

19        Hermann testified that blood coagulates in about a minute, but this rate varies person-to-

20   person. *Id.* at 1004. The more blood there is, the longer it will take for its coagulation to be

21   noticeable. *Id.* It is not possible to say in any given case how soon after death the blood will start

22   to coagulate, as the rate of coagulation is impacted by many variables. *Id.* at 1007. If Cynthia

23   had been killed between 8:50 and 9:15, it would be possible for the blood to begin noticeably

24   coagulating at 10:15. *Id.* at 1007-08. It would also be possible for the blood to begin noticeably

25   coagulating at that time if she had been killed between 7:50 and 8:50. *Id.* at 1009.

26        Sherrell Powell worked with petitioner in 1993 and 1994 at the Austin Creek Apartments

27   in Vallejo. *Id.* at 278. She lived at the apartments until 1995. *Id.* at 279. Petitioner was a

28                                                      13

maintenance man there.  *Id.*  Powell reluctantly testified that petitioner had once jokingly said to her, "Sherrell, you know everybody in Vallejo.  Do you know anybody I could get to kill Cynthia for $1000?"  *Id.* at 280-82, 285.  Petitioner had told Powell he was unhappy with Cynthia and wanted to divorce her because she did not want to have kids.  *Id.* at 283-24.  Powell told petitioner's investigator she had been on crack for five days when she told police about petitioner's incriminating statements.  *Id.* at 287.  She testified at trial that she had been lying to the investigator, however, so as not to appear a "snitch."  *Id.*  Powell had also lied on part of her job application for the Austin Creek Apartments.  *Id.* at 293-94.  She had never seen petitioner beat up anybody.  *Id.* at 340.  He was nice to her.  *Id.*  Defense investigator T.J. Hicks testified that Powell told him that petitioner had told her he loved Cynthia.  *Id.* at 783

Allen Ames lived at the Austin Creek Apartments and befriended petitioner there.  *Id.* at 350-51.  During the two years before Cynthia's murder, petitioner had expressed both positive and negative feelings about his marriage to Ames.  *Id.* at 351-53.  Petitioner was upset that Cynthia did not want to have children or pursue custody of Mary Lee because he wanted to benefit from a tax deduction related to her.  *Id.* at 353-54.

Pacita Lee moved in to the Austin Creek Apartments in 1992.  *Id.* at 558.  She lived there for three years and also worked as the assistant manager, and knew petitioner.  *Id.* at 559.  She last saw petitioner in September 1994.  *Id.* at 560.  When they worked together at the apartment complex, she saw him every day.  *Id.*  Petitioner told her many times that he wanted to divorce Cynthia because she did not want to have children.  *Id.* at 560-61.  Three times, petitioner talked about his wife ending up dead, joking that if she died he could have the insurance money.  *Id.* at 561-62.  On one occasion, Lee and her husband got drunk with petitioner in their kitchen.  *Id.* at 563.  He became upset about Cynthia, cried, and punched the oven.  *Id.*  On other occasions, petitioner told Lee that he loved his wife.  *Id.* at 574.  Once, petitioner approached Lee and cautioned her that Sherrell Powell would tell her that petitioner had asked Powell if she could find someone to kill his wife for $1000, but that Lee should not trust Powell.  *Id.* at 586-87.

/////

14

1       Mr. Hicks testified that Lee told him that petitioner had never said he wanted his wife

2 dead and that she was not present when petitioner discussed hiring someone to kill his wife with

3 Powell. *Id.* at 783-84.

4       Elsa Peregrina also worked with petitioner at the apartment complex in 1994 and before.

5 *Id.* at 615-16.  She saw him every day and considered him a friend.  *Id.* at 617.  She last saw him

6 about a year and a half before the murder.  *Id.* at 620.  The day after petitioner told her he was

7 getting a large amount of life insurance on Cynthia, he asked Peregrina how he could get rid of

8 Cynthia.  *Id.* at 618-19.  He then said, "If something happened to her, you would never believe I

9 didn't do it, Elsa?"  *Id.*  Petitioner made jokes about getting rid of his wife often enough that

10 Peregrina did not take his comments seriously.  *Id.* at 624-25.  During their friendship, he had

11 voiced complaints about Cynthia; that she was no fun and didn't want children.  *Id.* at 619.  She

12 advised him to divorce Cynthia, but he wouldn't do it.  *Id.* at 620.  Mr. Hicks testified that

13 Peregrina told him that she had never said that petitioner wanted to get rid of Cynthia.  *Id.* at 785.

14       Debra Appel worked at the apartment complex with petitioner in 1991 for about a year

15 and kept in touch with him afterward.  *Id.* at 1059.  Petitioner told her many times that he was not

16 happy in his marriage.  *Id.* at 1060.  In one instance, petitioner told Appel that he wished he could

17 find a way to do away with Cynthia, fix her brakes or something like that, because they had been

18 arguing.  *Id.* at 1061.  She responded by telling petitioner, "That's not very funny."  *Id.*  He

19 replied, "I know.  Now if something happen[s] to Cynthia you would think I did it."  *Id.*

20       Arora Angeles sold the Stringers an insurance policy on Cynthia's life in 1991 with a

21 payout of $100,000.  *Id.* at 487-88.  The policy was active at the time of Cynthia's murder and

22 benefitted petitioner.  *Id.* at 489-90.  Although petitioner had some historical health problems,

23 Angeles was willing to try to obtain insurance for him as well.  *Id.* at 499-501.  Ms. Angeles

24 testified that petitioner was not interested.  *Id.*  However, it was subsequently established that

25 Stringer had in fact gotten a policy on his own life as well.  The prosecution later stipulated that

26 petitioner did sign a claim form and obtained a $50,000 policy naming Cynthia as his beneficiary

27 that was maintained through the date of her death.  *Id.* at 1086-87.  In the month after Cynthia

28

1   died, Angeles sent petitioner a claim form, but he did not return it. *Id.* at 501-02.

2          Mary Lee Lagrosa was Cynthia's niece. *Id.* at 596.  In April 1995, she was in sixth grade,

3   and her school-day began at 8:35 a.m. *Id.* at 598.  Cynthia generally took her to school, but if on

4   occasions she was not able to do so, Mary Lee's father would take her. *Id.*  On April 28, 1995,

5   both Mary Lee and Cynthia were running late. Usually Cynthia would pick up Mary Lee around

6   8:15 or 8:20. *Id.* at 607.  But on April 28 at around 8:25 or 8:30 a.m., Mary Lee called Cynthia's

7   house *Id.*  Petitioner answered the phone and told her Cynthia, too, was running late and was still

8   lying down. *Id.* at 600-01.  Petitioner's voice was quiet and sad. *Id.* at 601, 613.  Mary Lee had

9   lived with the Stringers for three years and often spent weekends with them. *Id.* at 610.  She had

10  never seen petitioner act violently toward Cynthia or seen any marks of violence on Cynthia. *Id.*

11  at 610-11.

12         Lynn Phorth owned Doughboy Donuts in Vallejo. *Id.* at 658.  On April 28, 1995,

13  petitioner came there. *Id.* at 659.  Surveillance footage and a receipt showed the time as 9:26 a.m.

14  *Id.* at 662, 669.  He ordered a muffin and a donut, but had forgotten his wallet. *Id.* at 660, 665.

15  Because he was a regular customer, Phorth told him he could pay next time. *Id.* at 660-61.

16  Phorth did not notice anything unusual in petitioner's demeanor or any blood. *Id.* at 666-67.

17         Patrick Garrett was petitioner's brother-in-law. *Id.* at 314.  On the morning of the murder,

18  he was working at Sign Factory in American Canyon. *Id.* at 314-15.  Petitioner came there a little

19  before 10 a.m. *Id.* at 315.  Garrett saw no blood on petitioner. *Id.*  Petitioner appeared to be in a

20  good mood. *Id.* at 315-16.  Petitioner was driving his truck. *Id.*  Garrett noticed nothing unusual

21  about petitioner. *Id.*

22         Robin Garrett is petitioner's sister. *Id.* at 946.  When petitioner was being questioned by

23  the police, she came to the station and asked repeatedly to see him. *Id.* at 952.  She left after an

24  hour and a half because Detective Bennigson would not let her see petitioner. *Id.* at 952-53.

25  Detective Meredith later drove petitioner to his mother's home, where Garrett met him. *Id.* at

26  953.  Before Meredith left, petitioner reminded him that he had forgotten to take petitioner's

27  blood for a test. *Id.* at 955.  Garrett drove petitioner back to the station so he could provide blood.

28                                                 16

1    *Id.* at 955-56.  While at the station, Meredith told Garrett to be careful not to be alone with

2    petitioner because he was dangerous.  *Id.* at 957.

3        After his conviction, petitioner sought DNA testing in the Solano County Superior Court

4    pursuant to California Penal Code § 1405.  The state court granted his request, and ordered testing

5    for 30 items of evidence.  ECF No. 90 at 3; ECF No. 90-4.  The results were largely inconclusive

6    or unremarkable (most DNA appearing to have come from Cynthia), with two notable exceptions.

7    First, a "clump of red-brown debris which tested positive for blood" found underneath Cynthia's

8    left thumbnail (ECF No. 90-1 at 5) contained a "DNA mixture of one unknown fifteen-locus

9    major male DNA profile and low-level DNA types from at least one minor contributor."  ECF

10    No. 90-1 at 1.  Petitioner was excluded as the source of the "major male DNA profile" and as the

11    minor contributor.  *Id.* at 9.  Second, two blood stains on a towel from the home's washing

12    machine were tested, and "[t]he DNA typing results provide strong evidence that Lonnie Stringer

13    is the source of the DNA detected" in those stains.  *Id.* at 1, 9.

14        In this federal petition, petitioner presents several grounds for relief, which can be placed

15    in three general categories: (1) ineffective assistance of trial counsel; (2) ineffective assistance of

16    appellate counsel; and (3) actual innocence.  ECF No. 2.  The question currently before the court

17    is whether petitioner has presented the court with such compelling evidence of his innocence that

18    these claims can be reached on their merits despite the passage of the limitations period.

19    Petitioner argues that the DNA results summarized above provide such compelling evidence.

20    ECF No. 90 at 9 ("Mr. Stringer now has conclusive DNA evidence which completely excludes

21    him as a source in every single piece of evidence that was tested.").  As discussed below, this

22    argument misstates the record by ignoring petitioner's DNA from the blood stains on the towels

23    found in the washing machine.

24        **II.**      **Petitioner's Evidence is Insufficient to Fall within the Innocence Exception to**

25            **AEDPA's Limitations Period**

26        A one year limitations period for seeking federal habeas relief begins to run from the latest

27    of the date the judgment became final on direct review, the date on which a state-created

28

1   impediment to filing is removed, the date the U.S. Supreme Court makes a new rule retroactively-

2   applicable to cases on collateral review, or the date on which the factual predicate of a claim

3   could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1).  The

4   court has already concluded, and the Ninth Circuit has affirmed, that the instant federal petition is

5   untimely under that statute and the case law interpreting it.  ECF Nos. 26, 30, 38.  The court may

6   consider the merits of the petition despite this untimeliness, however, if petitioner persuades the

7   court that, in light of new evidence, it is probable that no reasonable juror would have voted to

8   find him guilty beyond a reasonable doubt.  *McQuiggin*, 569 U.S. at 386-87.

9        The innocence exception is demanding and thus seldom met.  *Id.* (citing *House v. Bell*,

10  547 U.S. 518, 538 (2006)); *Stewart v. Cate*, 757 F.3d 929, 938 (9th Cir. 2014) (describing the

11  standard governing the exception as "exacting" and setting "an extremely high hurdle" for the

12  habeas petitioner).  It requires the petitioner to support his claim of innocence with new reliable

13  evidence (like exculpatory scientific or other physical evidence or eyewitness accounts) that was

14  not presented at trial.  *Lee*, 653 F.3d at 938.  The court then assesses how reasonable jurors would

15  react to the overall, newly supplemented record, including the new evidence.  *Stewart*, 757 F.3d

16  at 938.  The court must additionally consider the timing of the federal petition as a factor bearing

17  on the reliability of the petitioner's evidence of innocence.  *McQuiggin*, 569 U.S. at 387.  "[A]

18  federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable

19  delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in

20  determining whether actual innocence has reliably been shown."  *Id.*

21       Petitioner argues that the new evidence of the blood of an unknown man found under one

22  of Cynthia's fingernails meets this exacting standard.  But petitioner overstates his case when he

23  says that the DNA evidence "completely excludes him as a source in every single piece of

24  evidence that was tested."  ECF No. 90 at 9.  In fact, DNA evidence indicates that blood stains

25  that had not been tested at the time of trial, taken from towels found inside the home's washing

26  machine, contained petitioner's DNA.  This evidence weighs in favor of the jury's guilty finding.

27  /////

28                                                        18

Moreover, beyond the DNA results, petitioner provides the court with no further evidence. Thus, the court lacks the facts it needs to assess the gravity of the DNA results (e.g., expert testimony as to the amount of blood, the age of the blood, and the possibility that the blood came from another source – say, one of Cynthia's patients – rather than the murderer).  Considering the equivocal new evidence petitioner has provided along with the evidence presented at trial, the court cannot say that it is probable that, with the benefit of the new evidence, no reasonable juror would have voted to find him guilty beyond a reasonable doubt.[1]

### III.    Conclusion and Recommendation

Petitioner fails to clear the "extremely high hurdle" required to consider his untimely petition on the basis of new evidence of innocence.  Accordingly, it is hereby RECOMMENDED that petitioner's request for testing of fingerprint evidence be denied and respondent's August 20, 2010 motion to dismiss (ECF No. 19) again be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

/////

/////

/////

---

[1] Petitioner asks the court to order testing of fingerprint evidence (and possibly hair evidence as well).  He provides no authority under which the court may order such testing.

19

1   2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

2   final order adverse to the applicant).

3   Dated:  April 14, 2020.

4                                          EDMUND F. BRENNAN

5                                          UNITED STATES MAGISTRATE JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          20