1

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                    FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12    LONNIE DAVID STRINGER,                    No.  2:09-cv-2980-KJM-EFB P

13                    Petitioner,

14           v.

15    JOHN MARSHALL,                            FINDINGS AND RECOMMENDATIONS

16                    Respondent.

17

18           Petitioner is a state prisoner with counsel seeking a writ of habeas corpus.  *See* 28 U.S.C.

19    § 2254.  Respondent moves to dismiss the petition as untimely.  ECF No. 19.  After a long

20    journey through this court and the Court of Appeals, the undersigned again recommends that the

21    motion to dismiss be granted.

22           I.      **Procedural Background**

23           Petitioner Lonnie Stringer initiated this case on October 19, 2009 to challenge his

24    conviction for the murder of his wife, Cynthia.  ECF No. 1.  On March 31, 2011, this court

25    granted respondent's motion to dismiss the petition as barred by the statute of limitations

26    contained in the Anti-terrorism and Effective Death Penalty Act ("AEDPA").  ECF No. 30.  Later

27    that year, the U.S. Court of Appeals for the Ninth Circuit concluded that AEDPA's limitations

28    provisions are subject to an equitable exception for claims of actual innocence.  *Lee v. Lampert*,

1

1  653 F.3d 929 (9th Cir. 2011) (*en banc*).  The United States Supreme Court agreed in 2013.

2  *McQuiggin v. Perkins*, 569 U.S. 383, 386-87 (2013).

3      On appeal, the Ninth Circuit affirmed this court's determinations that: (1) petitioner is not

4  entitled to statutory tolling; (2) the federal statute of limitations began to run when petitioner's

5  conviction became final; and (3) petitioner is not entitled to equitable tolling.  ECF No. 38.

6  However, because this court did not consider whether petitioner qualified for the equitable

7  exception based on actual innocence, the Ninth Circuit remanded the case for consideration of

8  that single issue, citing *McQuiggin.  Id.*

9      On remand, this court ordered supplemental briefing and the state court record to address

10  the actual innocence issue.  ECF No. 40.  The court then, at petitioner's request, stayed the case

11  pending the outcome of DNA testing ordered by the state court.[1]  ECF No. 60.  The court lifted

12  the stay on July 16, 2019 and ordered petitioner to file "a supplemental brief that includes all

13  arguments he wishes to raise regarding the application of the equitable exception for claims of

14  actual innocence to his case."  ECF No. 89 at 2.  The court cautioned petitioner that the

15  supplemental brief would supersede petitioner's prior supplemental brief (ECF No. 45).  *Id.*

16  Petitioner filed a second supplemental brief on August 15, 2019.  ECF No. 90.  Petitioner did not

17  include previous arguments in support of his claim of actual innocence, choosing to focus on the

18  DNA results.  *Id.*  The undersigned found those results did not meet the standard for establishing

19  actual innocence such that petitioner could proceed with his case despite its untimeliness and

20  therefore recommended that respondent's motion to dismiss be granted.  ECF No. 93.

21      The district judge agreed that the DNA results, alone, did not establish actual innocence.

22  ECF No. 98 at 2.  The district judge also recognized that petitioner had been expressly ordered to

23  include all bases for his actual innocence claim in his final supplemental brief and had included

24  arguments relating to the DNA evidence only.  *Id.*  However, the district judge concluded that

25

26      [1] Thirty items of evidence were tested per the state court order.  ECF No. 90 at 3.  Only

27  two items yielded probative results.  First, a "clump of red-brown debris" beneath Cynthia's
    fingernail contained male DNA not belonging to petitioner.  Second, testing of two blood stains

28  on a towel found in the washing machine near the crime scene provided "strong evidence" that
    petitioner was the source of DNA found therein.

2

petitioner had submitted, in other filings, apparently "compelling evidence of third-party culpability." *Id.* To avoid the possibility that petitioner be "a victim of his counsel's mistakes," the district judge declined to adopt the recommendation to dismiss and referred the matter back to the undersigned to consider, in addition to the final supplemental brief, petitioner's first supplemental brief (ECF No. 45) and his amended petition (ECF No. 11). The district judge also directed the undersigned to reconsider whether petitioner's request for an order requiring the state to perform additional forensic testing should be denied. ECF No. 98 at 4.

In this federal petition, petitioner presents several grounds for relief, which can be placed in three general categories: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; and (3) actual innocence. ECF No. 2. Thus, the question currently before the court is whether petitioner has presented such compelling evidence of his innocence that these claims can be reached on their merits despite the passage of the limitations period. Having considered petitioner's earlier filings, as directed, as well as his request for an order compelling further processing of evidence by state authorities, the undersigned again recommends that the case be dismissed as untimely.

## II.     The Innocence Exception to AEDPA's Limitations Period

A one year limitations period for seeking federal habeas relief begins to run from the latest of the date the judgment became final on direct review, the date on which a state-created impediment to filing is removed, the date the U.S. Supreme Court makes a new rule retroactively-applicable to cases on collateral review, or the date on which the factual predicate of a claim could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1). The court has already concluded, and the Ninth Circuit has affirmed, that the instant federal petition is untimely under that statute and the case law interpreting it. ECF Nos. 26, 30, 38. The court may consider the merits of the petition despite this untimeliness, however, if petitioner persuades the court that, in light of new evidence, it is probable that no reasonable juror would have voted to find him guilty beyond a reasonable doubt. *McQuiggin*, 569 U.S. at 386-87. This is the so-called "*Schlup* gateway," named for the 1995 U.S. Supreme Court case *Schlup v. Delo*, 513 U.S. 298.
/////

1   It is worth discussing *Schlup* and its progeny in some detail to illustrate the limited scope and

2   application of the gateway.

3   **A.  *Schlup***

4   Lloyd Schlup was convicted of participating in the stabbing murder of fellow inmate

5   Arthur Dade in the Missouri State Penitentiary and sentenced to death.  513 U.S. at 301-02.  At

6   his trial, the state's case rested primarily on the eyewitness testimony of two correctional officers:

7   Sergeant Roger Flowers and Officer John Maylee.  *Id.* at 302.  Sergeant Flowers testified that, on

8   the day of the killing, he had been on duty in an area of the prison known as Walk 1 and Walk 2.

9   *Id.*  He released the inmates on Walk 2 for lunch and relocked their cells.  *Id.*  He then unlocked

10   the cells on Walk 1 and noticed inmate Rodnie Stewart moving against the flow of traffic while

11   carrying a container of steaming liquid.  *Id.*  Flowers saw Stewart throw the liquid in Dade's face.

12   *Id.*  Flowers testified that Schlup then jumped on Dade's back and inmate Robert O'Neal joined

13   the attack.  *Id.*  Flowers called for help, entered the walk, and apprehended Stewart as the other

14   two attackers fled.  *Id.*

15   Maylee testified that he saw the attack from Walk 7, located about 40-50 feet above

16   Walks 1 and 2.  *Id.*  He saw Schlup, Stewart, and O'Neal run from Walk 2 to Walk 1 against

17   traffic.  *Id.*  Stewart threw a container of liquid at Dade's face, and Schlup jumped on Dade's

18   back.  *Id.*  O'Neal then stabbed Dade in the chest, ran down the walk, and threw the weapon out

19   of a window.  *Id.*

20   No physical evidence was presented at trial that connected Schlup to the stabbing.  *Id.*  By

21   contrast, Stewart had been apprehended by Flowers during the incident, and, when he was

22   apprehended, O'Neal was covered in blood and he was bleeding from cuts on his right hand.  *Id.*

23   Schlup claimed that he was not involved in the attack.  *Id.* at 303.  A videotape showed

24   that Schlup had been the first inmate to walk through the dining room for lunch and obtain his

25   meal through the line.  *Id.*  About 65 seconds after he entered the dining room, several guards ran

26   out in response to a distress call, and 26 seconds later, O'Neal ran into the dining room dripping

27   blood.  *Id.*  Schlup argued that the tape showed he could not have participated in the attack.  *Id.* at

28   303-04.  But, if there had been a delay between the stabbing and the distress call, it might have

4

been possible for Schlup to participate and still get to the dining room over a minute before the distress call went out. *Id.* at 304. Testimony elicited by the prosecutor tended to show that such a delay was possible because: (1) the officers did not have radios to call for immediate help; (2) after Flowers shouted for help, it took him a couple of minutes to subdue Stewart; and (3) Captain James Eberle radioed for help about a minute after Flowers brought Stewart downstairs. In addition, a prison investigator testified that he could run from the crime scene to the dining room in 33 seconds and walk there at a normal pace in 97 seconds. *Id.* at 304-05.

Schlup argued that Flowers and Maylee were mistaken in their identification. *Id.* at 304 n.6. Schlup pointed to inconsistencies between the two officers' testimonies: Flowers testified that he saw only Stewart running against the flow of traffic while O'Neal and Schlup were at the other end of the walk, while Maylee testified that he saw all three inmates running against traffic. *Id.*

Schlup was convicted, sentenced to death, and eventually sought federal habeas relief. *Id.* at 305-06. The district court found his claim procedurally barred because Schlup had not raised it on appeal. *Id.* at 306 & n.15. The court of appeals affirmed on other grounds. *Id.* at 306-07. Schlup later filed a second habeas petition. *Id.* at 307. He argued that he was actually innocent, that trial counsel had deficiently failed to interview alibi witnesses, and that the state had not disclosed critical exculpatory evidence. *Id.* To its response the state attached an affidavit of John Green, an inmate who had been working as a clerk in the housing unit at the time of the murder. *Id.* Green attested that Flowers had told him to call for help and that he had notified base of the altercation shortly after it began. *Id.*

Schlup responded that the Green affidavit provided proof of his innocence, because it showed that a call for help had gone out immediately; i.e., there had been no delay between the attack and the call for help. *Id.* at 308. Schlup also submitted affidavits from inmate witnesses to the stabbing who attested that he had not been present. *Id.* Two inmates suggested that inmate Randy Jordan, who lived in a cell between Stewart and O'Neal on Walk 2 and who arrived at lunch with O'Neal (as shown by videotape), was the third attacker. *Id.* at 308-09.

/////

The district court found the second petition procedurally barred. *Id.* at 309. Schlup asked the court to reconsider, submitting another affidavit from Green attesting to his call to base and additionally attesting that he had seen the attack and that Randy Jordan had been the third attacker. *Id.* at 310 & n.21. Green averred that he had called base no more than 60 seconds after Dade had been stabbed by Jordan and O'Neal. *Id.* But the district court declined to reconsider its ruling. *Id.* at 310.

The Court of Appeals initially affirmed. *Id.* at 311. Schlup then produced an affidavit from former lieutenant Robert Faherty, who attested that he had passed Schlup on the way to lunch on the day of the murder and had reprimanded him for shouting out a window. *Id.* Schlup was walking at a leisurely pace, was not sweating, was not nervous, and was in Faherty's presence for at least two-and-a-half minutes. *Id.* at 311-12. Nevertheless, the appellate court again affirmed the denial of Schlup's habeas petition. *Id.* at 312-13.

The Supreme Court granted certiorari and reversed the denial of the petition. The Court clarified and explained the standard courts must apply when determining whether, based on evidence of innocence, a court should hear the merits of a habeas petition despite a procedural default. The Court articulated that standard in a number of ways, but most clearly here: to pass through the "*Schlup* gateway" (as it has come to be known), "the habeas petitioner [must] show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. "To be credible, such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id.* at 324. The court then considers that evidence along with any other evidence, including evidence that was either excluded from or unavailable at trial. *Id.* at 327-28. To allow the petition through the gateway, the court must conclude that, "in light of the new evidence, no juror, acting reasonably, would have voted to find [the petitioner] guilty beyond a reasonable doubt." *Id.* at 329.

1   The Court concluded that Schlup's new evidence (sworn statements of eyewitnesses that

2   Schlup was not involved and that cast doubt on the practicability of Schlup's participation in light

3   of the timing of the distress call and his arrival in the lunch line), if true, cast doubt on Schlup's

4   conviction. *Id.* at 331. It remanded the case to the lower courts to assess the evidence in light of

5   the clarified standard. *Id.* at 331-32.

6   ### B. *House v. Bell*

7   The Supreme Court revisited the *Schlup* gateway in the case of Paul House, who had been

8   convicted of murdering Carolyn Muncey and sentenced to death. 547 U.S. 518, (2006).

9   Local residents discovered Muncey's body concealed in brush and tree branches on an

10   embankment about 100 yards up the road from her driveway on the afternoon of July 14, 1985.

11   *Id.* at 522. The previous evening, Muncey had visited neighbor Pam Luttrell with her two

12   children Matthew and Lora. *Id.* Luttrell testified that Muncey had told her that Muncey's

13   husband, William, had gone to dig a grave but was going to take Muncey fishing the following

14   day. *Id.* After Muncey left, and at some time before 11 p.m., Luttrell heard a car rev its motor as

15   it went down the road. *Id.* William customarily revved his car in this manner as he passed the

16   Luttrell house on his way home. *Id.*

17   At 1 a.m., William appeared at Luttrell's house with his two children and told her that his

18   wife was missing. *Id.* at 522-23. Lora told Luttrell that, during the night, she had heard her

19   mother crying as she descended the steps of their house. *Id.* at 523. While Lora was talking,

20   Matthew interrupted to say, "They said daddy had a wreck." *Id.*

21   At trial, Lora testified that she and her brother had gone to bed after returning from the

22   Luttrell home. *Id.* At some point, she heard a deep voice, which sounded like her paternal

23   grandfather William Sr., ask where her father was. *Id.* Her mother replied that William Jr. was

24   digging a grave. *Id.* She was not certain that the voice belonged to her grandfather. *Id.* at 524.

25   Later she heard someone tell her mother that her father had had a wreck by the creek and heard

26   her mother crying. *Id.*

27   Some time later, Lora and Matthew left the house to look unsuccessfully for their mother.

28   *Id.* When they got home, William came home, fixed himself a sandwich, and asked where

7

Muncey was.  *Id.*  William went outside, and, not seeing his wife, took the children to the Luttrell house so he could continue to look for her.  *Id.*

The next afternoon, Billy Ray Hensley came to help look for Muncey.  *Id.*  He testified that, as he approached the Muncey's street, he saw House come out from an embankment while wiping his hands on a black rag for "just a glance."  *Id.* at 524-25.  But Billy Hankins, a witness for the defense, testified that he had seen a "boy" (presumably House) at that time on the opposite side of the street, where a white Plymouth was parked.  *Id.* at 525.

A few minutes later, Hensley saw House driving the white Plymouth.  *Id.*  House flagged Hensley down and told Hensley he had heard that Muncey was missing and he was looking for her husband.  *Id.*  House told Hensley that he had heard that William was elsewhere, getting drunk.  *Id.*  House had recently moved to the area and become acquainted with the Muncey's, and he considered them friends.  *Id.*

Hensley became suspicious of House and returned to the Muncey's street with his friend, Jack Adkins.  *Id.*  They checked the embankment, where Adkins found Muncey's body.  *Id.* at 525-26.

Pathologist Alex Carabia testified that Muncey had died between 9 and 11 p.m.  *Id.* at 526.  She was found with a black eye and both hands bloodstained up to the wrists.  *Id.*  Muncey's legs and neck were bruised in a manner consistent with a fight or a fall on hard objects.  *Id.*  Carabia concluded that she had been choked and had died from a severe blow to the head.  *Id.*

In his interviews with law enforcement shortly after Muncey was found, House, who was on probation following release from prison for aggravated sexual assault, lied that he had spent the entire evening with his girlfriend, Donna Turner, at her trailer.  *Id.*  He also lied that he was wearing the same pants he had worn the night before.  *Id.*  He had scratches on his arms and hands and a bruised knuckle.  *Id.* at 527.  House said he had gotten the scratches from Turner's cat and the bruise from a recent construction work.  *Id.*

But Turner told authorities that House had left her trailer (located about 2 miles from the Muncey home) around 10:30 or 10:45 p.m. to go for a walk.  *Id.*  He returned sometime later, hot, panting, and missing his shirt and shoes.  *Id.*  House told Turner that, during his walk, a car had

pulled up along side him and a person inside called him names and told him he did not belong there anymore. *Id.* Someone got out from the car and grabbed him by the shoulder, tearing his tank top (blue with yellow trim). *Id.* House swung around with his right hand and hit something. *Id.* House told Turner that he then took off down the embankment and started running while his assailants fired two shots at him. *Id.* He discarded his torn shirt while running. *Id.* Turner thought maybe her ex-husband had something to do with the incident. *Id.* Turner insisted that House had not used her car that night, and no evidence connected to the crime was found therein. *Id.*

In his interviews with police, William said that he had had sex with his wife the morning before her disappearance. *Id.* He had spent the evening not digging a grave but rather at a dance about a mile-and-a-half from his home. *Id.* at 528. He left the dance early, but said it was only a brief trip to get beer. *Id.*

Two days later, police seized the heavily soiled pants House had been wearing on the night of the murder from a laundry hamper in Turner's trailer. *Id.* Agent Scott testified to seeing "reddish spots" that he suspected were blood on the pants. *Id.* The next day, two local policemen traveled to the FBI in Washington, D.C., with the pants, blood samples from Muncey's autopsy, and other evidence packed in a box. *Id.* After initial FBI testing revealed human blood on the pants, House was arrested. *Id.*

At trial, the state presented witnesses Luttrell, Lora Muncey, Adkins, Hensley, Dr. Carabia, and various law enforcement officers. *Id.* The state relied heavily on the results of FBI testing, which showed semen that was seemingly consistent with House's on Muncey's nightgown and panties and small bloodstains on House's jeans that were consistent with Muncey's blood but not House's blood. *Id.* at 528-29. No hair or fibers consistent with Muncey's hair or clothing was found on the jeans. *Id.* at 529.

The defense put on evidence indicating that William had abused his wife and that she was scared of him. *Id.* Ricky Green, Muncey's brother, had seen a drunken William punch Muncey a few years before her death. *Id.* Turner testified that House's shoes were found several months after the murder in a field near her trailer. *Id.* She took them to the authorities. *Id.* (The shoes

9

1   were tested for blood and none was found, but the state did not provide this information to the

2   defense or the jury.  *Id.*).

3         The prosecutor summed up his reconstruction of the crime for the jury – that House had

4   come to the Muncey home and told Muncey that William had been in an accident as a pretext to

5   get her out of the house and subject her to "some kind of indignity."  *Id.* at 530.  The jury found

6   House guilty.  *Id.* at 532.

7         In arguing for a death sentence, the prosecutor told the jury that "the proof shows strong

8   evidence of attempted sexual molestation."  *Id.* at 533.  The jury recommended a death sentence,

9   and the judge imposed it.  *Id.*

10        In his federal habeas petition, House presented evidence that undermined the state's case

11   against him.  First, DNA testing of the semen on Muncey's clothes demonstrated that it had come

12   from William, her husband, and not House, seriously undermining the prosecution's argument

13   that House had lured her from her house to subject her to "some indignity."  *Id.* at 540-41.

14   Without that argument, the jury would have been left without a clear motive for House to commit

15   the crime.  *Id.* at 541.

16        Second, a pathology expert testified that the blood on House's pants was too chemically

17   degraded, and too similar to the blood collected during the autopsy, to have come from Muncey

18   on the night of the crime.  *Id.* at 542.  He concluded that, based on the manner in which it had

19   degraded, the blood on the jeans came from vials of blood collected during the autopsy and not

20   from Muncey's live or recently-deceased body.  *Id.* at 542-43.

21        Other evidence supported this conclusion.  After the autopsy, the blood vials had been

22   placed in a Styrofoam box and then packed in the same cardboard box as House's jeans, which

23   were in a paper bag.  *Id.* at 543.  Two policemen then drove the box for 10 hours from Tennessee

24   to the FBI in Washington, D.C.  *Id.*  It was summer.  *Id.*  The pathology expert stated that blood

25   vials in hot conditions (like a car trunk in summer) can blow open, and, in fact, when the blood

26   reached the FBI it had hemolyzed due to heat exposure.  *Id.*  By the time it arrived at the FBI,

27   about a vial and a half were empty.  *Id.*  Blood had seeped onto one corner of the Styrofoam box

28   and onto the packing gauze under the vials.  *Id.*

1   FBI records indicated that the pants had arrived at the FBI in a paper bag, but the record

2   did not contain such a bag.  *Id.*  Instead, the record contained a plastic bag with a label listing the

3   pants.  *Id.*  The plastic bag had blood running down its outside front.  *Id.*  This evidence suggested

4   that the small and disparate blood on the pants had come from spillage during transport rather

5   than from the commission of the crime, a suggestion buttressed by the absence of blood on

6   House's shoes.  *Id.* at 547.

7   Third, House presented evidence from many sources that William regularly abused his

8   wife.  *Id.* at 548.  One witness testified that Muncey "was constantly with black eyes and busted

9   mouth."  *Id.*  Another testified that William had said in her presence that he was upset with his

10   wife and "was going to get rid of that woman one way or another."  *Id.* at 548-49.  A third witness

11   said she had seen William backhand Muncey on the night of the murder in the parking lot of the

12   dance.  *Id.* at 549.  A fourth witness testified that William had come to her the morning after the

13   murder and asked her to lie that she had seen him at the dance and had breakfast with him early

14   that morning.  *Id.*  Two additional witnesses testified that, around the time of House's trial,

15   William had confessed that he had committed the crime.  *Id.*  According to the witnesses, he had

16   slapped Muncey and she had fallen and hit her head and died, and he "didn't mean for it to

17   happen."  *Id.*

18   One of these witnesses, Penny Letner, testified that, during or just after House's trial,

19   William had intruded on a gathering at Kathy Parker's home.  *Id.*  (Parker was the other witness

20   to the confession.)  William "went to crying and was talking about his wife and her death and he

21   was saying that he didn't mean to do it."  *Id.*  "Didn't mean to do what?" asked Letner.  *Id.*

22   According to Letner, William replied that Muncey had been "bitching him out" because he didn't

23   take her fishing that night but had gone to the dance instead.  *Id.*  (This echoed the trial testimony

24   of Luttrell, who said that Muncey had told her that William was going to take her fishing.)  When

25   he came home from the dance, she continued "bitching," and William responded by smacking

26   her, which caused her to fall to the ground.  *Id.*  "He said I didn't mean to do it, but I had to get

27   rid of her, because I didn't want to be charged with murder," testified Letner.  *Id.*

28   /////

11

Letner, 19 years old at the time, was too frightened to go to the authorities.  *Id.*  But Parker testified that she had: "I went to speak to the Sheriff but he was real busy. . . [and] sent me to a deputy.  The deputy told me to go upstairs to the courtroom and talk to this guy, I can't remember his name.  I never did really get to talk to anybody."  *Id.*  Parker's mother confirmed that she had driven Parker to the courthouse to talk to some people about the case.  *Id.*

In addition, while William told police he had left the dance only briefly, the security officer at the dance could not recall seeing him return.  *Id.* at 550-51.

The Court noted that a good deal of evidence still favored the state's case.  *Id.* at 552-53.  While "the issue [was] close," the Court concluded that House presented "the rare case where – had the jury heard all the conflicting testimony – it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt."  *Id.* at 554.

## C. *McQuiggin*

Lastly, we come to the case of Floyd Perkins, convicted of the murder of Rodney Henderson.  569 U.S. at 387-88.  On March 4, 1993, Perkins left a party with his friend, Henderson, and acquaintance Damarr Jones.  *Id.* at 387.  Henderson's body was discovered later on a wooded trail; he had died from stab wounds to the head.  *Id.*

At trial, Jones testified that Perkins had committed the murder while he looked on.  *Id.* at 388.  Chauncy Vaughn, friends with Perkins and Henderson, testified that Perkins had told him he would kill Henderson.  *Id.*  Vaughn further testified that Perkins called him afterward and confessed to the murder.  *Id.*  Another friend, Torriano Player, testified that Perkins told him that if he had known how Player felt about Henderson, he would not have killed him.  *Id.*

Perkins testified that he left Henderson and Jones to buy cigarettes.  *Id.*  When he came out of the store, Henderson and Jones were gone.  *Id.*  Perkins went to visit his girlfriend, and an hour later he saw Jones standing under a streetlight with blood on his pants, shoes, and plaid coat.  *Id.*

Perkins was convicted of murder and sentenced to life without parole.  *Id.*  His federal habeas petition came in 2008 – 10 years too late under AEDPA.  *Id.* at 389.  To overcome the barrier of the limitations period, Perkins argued that he had new evidence of his innocence.  *Id.*

The district court rejected this argument.  The court concluded that Perkins had failed to diligently pursue his rights and found that the evidence was not compelling enough to bring the case through the *Schlup* gateway for consideration of its merits.  *Id.* at 390.  The U.S. Court of Appeals for the Sixth Circuit reversed, holding that reasonable diligence was not a precondition to the application of the gateway.  *Id.*  The Supreme Court granted certiorari to resolve a split among the courts of appeals as to whether the limitations period could be overcome by a showing of actual innocence.  *Id.*  (Previously the *Schlup* gateway had been confined in some circuits to petitions that had been procedurally defaulted but were timely.)

Perkins's "new" evidence consisted of three affidavits.  *Id.* at 389.  Ronda Hudson (Perkins's sister) averred on January 30, 1997, that she had heard from Louis Ford that Jones had bragged about stabbing Henderson and had taken his clothes to the cleaners after the murder.  *Id.*  Demond Louis (Chauncey Vaughn's brother) averred on March 16, 1999 that, on the night of the murder, Jones confessed that he had just killed Henderson.  *Id.*  Louis described Jones that night as wearing a colorful shirt and bloodstained orange shoes and pants.  *Id.*  The next day, Louis went with Jones to a dumpster, where Jones threw out the shoes, and then to the cleaners.  *Id.*  Linda Fleming, an employee at Pro-Clean Cleaners at the time of the murder, averred on July 16, 2002 that on or about March 4, 1993, a man matching Jones's description came to the store and asked her whether blood stains could be removed from a shirt and pants he had brought in.  *Id.*  She recalled that the pants were orange, the shirt was multi-colored, and both were heavily stained with blood.  *Id.*

The Supreme Court used Perkins's case to hold that the *Schlup* gateway may be used to overcome an expired limitations period.  *Id.* at 386.  The Court further clarified that there is no diligence requirement to the presentation of an untimely claim pursued under *Schlup*.  *Id.* at 398-99.  Nevertheless, courts may consider unexplained delay in presenting new evidence in analyzing whether a petitioner has made the showing required by *Schlup.  Id.* at 399.

Having "explained that untimeliness, although not an unyielding ground for dismissal of a petition, does bear on the credibility of evidence proffered to show actual innocence," the Court noted that the district court had already looked at Perkins's proffer and found it wanting.  *Id.* at

1    401.  As noted earlier, the district court had found that the three affidavits were "hardly adequate"

2    to meet the *Schlup* standard.  *Id.* at 400-01.  The Supreme Court stated explicitly that, "absent

3    cause, which we do not currently see," there was no reason for the Sixth Circuit to disturb that

4    finding.  *Id.* at 401.

5         In sum, the innocence exception is demanding and thus seldom met.  *Id.*; *Stewart v. Cate*,

6    757 F.3d 929, 938 (9th Cir. 2014) (describing the standard governing the exception as "exacting"

7    and setting "an extremely high hurdle" for the habeas petitioner).  It requires the petitioner to

8    support his claim of innocence with new reliable evidence that was not presented at trial.  *Lee*,

9    653 F.3d at 938.  The court then assesses how reasonable jurors would react to the overall, newly

10   supplemented record, including the new evidence.  *Stewart*, 757 F.3d at 938.  The court must

11   additionally consider the timing of the federal petition as a factor bearing on the reliability of the

12   petitioner's evidence of innocence.  *McQuiggin*, 569 U.S. at 387.  "[A] federal habeas court,

13   faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas

14   petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual

15   innocence has reliably been shown."  *Id.*

16        The three cases summarized above – two in which the petitioner was allowed through the

17   gateway and one in which he was not – provide valuable illustrations of the kinds of evidence that

18   make the showing required by *Schlup* and the kinds of evidence that do not.  The *Schlup* Court

19   categorized worthy evidence as (1) exculpatory scientific evidence, (2) trustworthy eyewitness

20   accounts, and (3) critical physical evidence.  513 U.S. at 324.  In *Schlup*, the petitioner presented

21   both trustworthy eyewitness accounts and critical physical evidence: new witnesses, including

22   three eyewitnesses who testified that the petitioner was not involved in the crime, and new

23   evidence that indicated a practical unlikelihood that petitioner could have committed the crime

24   due to its timing.  In *House*, the petitioner presented evidence in nearly all three categories:

25   witnesses (who, while not eyewitnesses to the murder, were disinterested and therefore more

26   trustworthy) to another man's confession, evidence that critical physical evidence relied on at trial

27   was corrupted, and exculpatory scientific evidence showing that semen found on the victim's

28   clothes did not belong to the petitioner.  Even still, the Court categorized the case as "close."  In

1   *McQuiggin*, the petitioner's evidence did not fall within these categories; he presented dated

2   affidavits from two witnesses (one of whom was related to the petitioner and the other known to

3   him) that another person had confessed to committing the murder and a corroborating affidavit

4   from a third witness.  He did not produce any exculpatory scientific evidence, testimony from

5   parties whose lack of interest in the case was established, or critical physical evidence.  Under

6   these circumstances, the Supreme Court saw no reason to disturb the district court's conclusion

7   that the petitioner had not met the exacting standard required to pass through the *Schlup* gateway.

8   With these illustrations in mind, we turn to the evidence before the court in Mr. Stringer's case.

9       **III.**   **Evidence at Trial**

10      In 1996, petitioner was convicted of second-degree murder in the death of his wife,

11  Cynthia Stringer.  ECF No. 52 (Notice of Lodging Document in Paper), Ex. 1, Clerk's Trial

12  Record (hereinafter "CT") at 272.  Evidence at the trial attested to the following facts:

13      At around 9:30 on the morning of Friday, April 28, 1995, Cynthia's[2] coworkers at Kaiser

14  Hospice learned that she had not shown up for a 9 a.m. home care appointment with patient

15  Marion Coleman.  ECF No. 52, Ex. 5, Reporter's Trial Transcript (hereinafter "RT") at 128-31,

16  139-40, 147.  They called Cynthia at home but received a busy signal.  *Id.* at 133.  They paged her

17  but did not get a call back.  *Id.* at 144-45.  Cynthia's coworker Larry Miller called the phone

18  company operator somewhere between around 9:30 to 10 a.m. to attempt to break through the

19  line.  *Id.* at 147-48, 145, 151.  The operator told Miller that she could not break through because

20  the phone was off the hook.  *Id.* at 145, 151-52.  Miller and another coworker, Phyllis Alexander,

21  then drove to Cynthia's home on Boggs Court.  *Id.* at 140-41, 151.  When they arrived at around

22  10:15 a.m., the home had been cordoned off by police.  *Id.*

23      Phone records revealed that a one-minute call had been placed from the Stringer home to

24  the Coleman home on the Wednesday before the murder (i.e., April 26) at 8:56 a.m., but no call

25  to the Coleman home had been placed on the morning of the murder.  *Id.* at 646.  Elaine Pavlatos,

26  receptionist to Cynthia's dentist, testified that she had called the Stringer home on the morning of

27  _____

28      [2] The court will use first names where it is useful to distinguish between family members
who share a surname.

1    the murder sometime between 9:30 and 10:15 and left a message on the answering machine to

2    remind Cynthia of an upcoming appointment.  *Id.* at 890-91.  James Gill, a friend of petitioner's,

3    testified that he left a message on the Stringer's phone at around 8:55 a.m. the morning of the

4    murder, but no such message existed on the phone's tape when later retrieved by police.  *Id.* at

5    910-12.  Patrick Garrett, petitioner's brother-in-law, witnessed Gill make a call at that time, but

6    testimony of other witnesses cast some doubt as to whether Gill actually called the Stringer home.

7    *Id.* at 963, 1053-54.

8         Cynthia's coworkers described her as extraordinarily punctual and very well-liked.  *Id.* at

9    136-37, 142-43, 148, 152-54.

10        Richard Niles and his wife, Lauren, were friends with petitioner and Cynthia, and the two

11   couples often socialized together.  *Id.* at 252-53, 266.  A few days before Cynthia's murder,

12   Richard loaned petitioner $1000, which petitioner said he would use to pay for truck driving

13   school.  *Id.* at 253-55.  The Niles' regarded petitioner as nonviolent and had never witnessed

14   petitioner act violently toward Cynthia.  *Id.* at 898-900.  Other friends and relatives also testified

15   that petitioner was not violent and that they had seen no indication that he had been violent

16   toward Cynthia.  *Id.* at 610-11, 906-07, 915, 927, 943, 960, 974, 990.

17        Cynthia attended bible study with her niece, Mary Lee, and Lauren Niles the night before

18   her murder.  *Id.* at 253, 266.  Cynthia and Lauren returned to the Niles home around 9 p.m. after

19   dropping Mary Lee back home.  *Id.* at 266, 268.  Cynthia changed her clothes using some she had

20   brought in a plastic bag.  *Id.* at 268, 270.  Petitioner arrived around 12:20 a.m.  *Id.* at 267.

21   Cynthia's car, which had been parked in the driveway, had a flat tire.  *Id.* at 268, 271.  Lauren

22   assumed that petitioner fixed the flat tire, as Cynthia and petitioner both left at around 12:35 a.m.

23   *Id.* at 268.

24        Michael Darling was the admissions director for Western Truck School in Sacramento.

25   *Id.* at 544.  Petitioner was a student at the school, with his first day of attendance being April 24,

26   1995.  *Id.* at 545.  He attended on April 24th and 26th, was absent on the 26th and 27th, and was

27   dropped from the school on the 28th.  *Id.* at 546-47.  He did not pay any tuition to the school.  *Id.*

28   at 546.  James Hartley was an instructor at the truck school.  *Id.* at 555.  He confirmed that

1  petitioner attended for two days, was absent for two days, and then was dropped during the week

2  of April 24, 1995.  *Id.* at 555-56.

3        Doris McKinney Price lived directly across the street from the Stringer house on April 28,

4  1995.  *Id.* at 237.  She left her house early that morning to buy fish with a friend but returned to

5  her house shortly after leaving because she had forgotten her purse.  *Id.*  When she left, she

6  noticed no activity on the street.  *Id.* at 237-38.  When she returned, she saw petitioner standing in

7  his driveway.  *Id.* at 239-40.  There were no police present.  *Id.* at 241.  Price estimated the time

8  as between 10 and 10:15 a.m.  *Id.*  Petitioner said, "Hi," to Price and she replied, "Hi.  Don't the

9  yard look nice?" as she went in her house.  *Id.* at 240.  Price had tried to be a friendly neighbor on

10  the street and speak to everybody, but petitioner had never spoken to her before that day.  *Id.* at

11  241.

12        Solita Gaspar lived on Boggs Court on the day of the murder.  *Id.* at 308.  She left just

13  before 10 a.m. that morning to go shopping at Mervyn's.  *Id.*  She saw nothing unusual, and had

14  heard nothing unusual in the morning before leaving.  *Id.* at 309.  She saw Cynthia's car but not

15  petitioner's red truck at the Stringer house.  *Id.* at 311-12.  When she returned before noon, police

16  and a crowd were in front of the Stringer house.  *Id.* at 309-10.  Gaspar would usually see Cynthia

17  in the mornings around 8 to 8:15 a.m. when Gaspar left to take her granddaughter to school.  *Id.*

18  at 310-11.

19        Michael Tobey went to Boggs Court on the morning of the murder to give Mike Boes an

20  estimate on two bathroom remodels.  *Id.* at 937.  He arrived at 9:10 a.m., saw nothing unusual in

21  the neighborhood, and found Boes at his kitchen table, in front of a window facing the street.  *Id.*

22  at 937-38.  When he left at 9:50 a.m., Tobey saw nothing unusual.  *Id.* at 938.

23        Boes saw petitioner driving his red truck away from the Stringer home around 8:45 a.m.

24  that morning.  *Id.* at 941.  He saw petitioner return in the truck around 10 a.m. from his kitchen

25  window.  *Id.*  He had been looking out the window continuously from around 8:45 to 9:10 and

26  had seen no pedestrians or any unusual activity.  *Id.* at 944.  He could not recall seeing any other

27  vehicles.  *Id.*  He returned to his seat before the kitchen window after looking at the bathrooms

28  with Tobey sometime before 10 a.m., looked out the window and again saw nothing unusual.  *Id.*

at 944-45.  A short time later, police arrived.  *Id.* at 942.  Boes saw petitioner being escorted to a police car, looking like he was very upset and in shock.  *Id.* at 943.

Elvira Rutter lived next door to the Stringers.  *Id.* at 503.  Her house had many skylights, so she could hear loud noises outside from within the house.  *Id.* at 503-04.  On the morning of the murder, she was at home with her daughter and husband, who was getting ready for a 10 a.m. appointment.  *Id.* at 504.  Ms. Rutter could not remember whether it was before or after her husband left for the appointment, but at some point petitioner came to her screen door, frantic, yelling for her to call 911 and running back to his house.  *Id.* at 504-09.  She called 911.  *Id.* at 509.

Philip Silva was a Vallejo police officer.  *Id.* at 394.  He was working on the morning of April 28, 1995 and received a radio instruction to go to the Stringer home because a woman was bleeding from the head.  *Id.* at 394-95.  He arrived shortly after being dispatched, along with Officer Ben Townsend, who he was training.  *Id.*  He could hear a male voice inside the residence, yelling.  *Id.* at 396.  He opened a "security-like" screen door and entered the house (the front door was open).  *Id.*  Silva and Townsend went to where the voice was coming from.  *Id.*  He found petitioner lying on top of what appeared to be kitchen rugs.  *Id.*  Petitioner was holding the phone and yelling for someone to "help her."  *Id.*  Silva took the phone from petitioner and placed the receiver on the counter without hanging it up.  *Id.* at 408, 991.  Petitioner had some blood on his face and hands and a little bit of blood on his clothes.  *Id.* at 413.  Silva grabbed petitioner and handed him to Townsend.  *Id.* at 412.

Under the rugs, he discovered the body of a woman.  *Id.* at 397.  The rugs had covered her all the way up over her face.  *Id.* at 413-14.  He checked to see if she was breathing or had a pulse, but found neither.  *Id.* at 397.  Silva saw a large wound on her head.  *Id.*  She was covered in blood from her head down her body.  *Id.*  There was a large pool of blood on the floor and a lot of blood on the counters.  *Id.*  The blood was coagulating, "chunky," "clumping," and "wet."  *Id.* at 402, 439.  Cynthia's skin was very cool to the touch and ashy-grey.  *Id.* at 398.  A hard, foamy, bloody substance was in her mouth.  *Id.*  No blood flowed from her wound.  *Id.* at 439.  He checked her arm for rigor mortis but felt none; her body was limp.  *Id.* at 398.  Later, after

18

1   sundown, the coroner arrived. *Id.* at 425.  The coroner checked for rigor mortis, and, Silva

2   believed, found none present. *Id.* (However, the parties later stipulated that Jim Burton, a Solano

3   County Deputy Coroner who was at the crime scene, wrote in his report of his examination of the

4   body at 8:30 p.m. "noted rigor mortis in the jaw, neck, and extremities." *Id.* at 789.)

5        The house was very well-kept, and Silva saw no signs of forced entry or ransacking after

6   checking every room and all windows and doors. *Id.* at 398-99.  He found no possible "clubbing

7   instruments." *Id.* at 399.  Along with Townsend and another officer, Jensen, Silva secured the

8   residence. *Id.*  They maintained security throughout the day for the detectives. *Id.*  Silva left the

9   Stringer home shortly after midnight. *Id.*

10       Silva touched the hoods of the vehicles at the house when he arrived. *Id.* at 414-15.

11   Cynthia's car was cool, and petitioner's truck was warm, indicating that it had been recently

12   driven. *Id.*  Silva found no bloody clothing or murder weapon in the house or truck. *Id.* at 434-

13   35.  He saw no blood in the house outside of the crime scene in the kitchen. *Id.* at 435-36.

14       Silva did not take care not to step in the pool of blood when he first arrived, as his first

15   concern was Cynthia's welfare. *Id.* at 402-03.

16       Officer Townsend testified that the house appeared clean when he and Silva arrived at

17   around 10:10 or 10:15 a.m. *Id.* at 443, 445.  Petitioner was very upset, distraught, and crying. *Id.*

18   at 978.  Silva grabbed petitioner and pulled him off the body. *Id.* at 482.  Townsend then

19   removed petitioner from the kitchen and had him sit on the couch in the living room. *Id.* at 444.

20   He then took petitioner to the patio, where petitioner said, "It's my fault," or words to that effect.

21   *Id.* at 444, 482.  Townsend asked petitioner what happened, and petitioner told him he had gone

22   to the donut shop, then a family member's house, and returned home. *Id.*  He, along with an

23   Officer Lawson, escorted petitioner to a police patrol car and placed him in the back seat. *Id.* at

24   461-62.  He helped secure the area with Officer Silva through the day until about 1 a.m. *Id.* at

25   444-45.  He dusted parts of Cynthia's car for prints but did not find any. *Id.* at 454.  Late that

26   night, as the body was being removed from the scene, Townsend touched the body to see what

27   rigor mortis was like, but he did not detect any stiffness. *Id.* at 476.

28   /////

1   Detective Matthew Meredith testified that he arrived at the Stringer home at around 10:30

2   on the morning of the murder. *Id.* at 810. He and his partner went into the house, which

3   appeared neat. *Id.* at 810-11. Later that morning, he interviewed and photographed petitioner at

4   the police station and took various items of clothing and jewelry from him as evidence, which he

5   later provided to criminalist Faye Springer. *Id.* at 811-12. Meredith did not notice any marks on

6   petitioner's body indicating that he had been in a struggle. *Id.* at 856. In the evening, he obtained

7   a blood sample from petitioner that he also provided to Springer. *Id.* at 813.

8   Detective Meredith's interview with petitioner lasted four to five hours. *Id.* at 814.

9   Petitioner told him that he had attended trucking school the previous day from 4 p.m. to midnight

10  and then went to the Niles's home to pick up Cynthia. *Id.* at 815-16. Petitioner told Meredith

11  that that morning Cynthia was running late for work. *Id.* at 816. She was still at home when

12  petitioner left the house at around 8:50 a.m. to run errands. *Id.* at 818. He first drove to an

13  animal shelter to look for a dog, but it was closed. *Id.* He next went to a donut shop for some

14  food. *Id.* at 819-20. After ordering, he realized he had no money. *Id.* at 820. The owners gave

15  him the food (a donut for himself and a muffin for Cynthia) on credit and he left. *Id.* Petitioner

16  told Meredith that he then went to the sign company where his brother-in-law, Pat Garrett,

17  worked. *Id.* He spoke with Garrett for around 10 minutes and then drove to his mother's house.

18  *Id.* at 820-21, 869. He went in the house and then left to return home. *Id.* at 821.

19  Once at the house on Boggs Court, petitioner told Detective Meredith, he retrieved his dog

20  from the backyard and tied him up in the back of petitioner's truck. *Id.* He had a brief

21  conversation with his across-the-street neighbor and then went in the house. *Id.* Once inside,

22  petitioner looked for Cynthia in the bedroom and then walked into the kitchen and found her. *Id.*

23  at 821-22. He shook her and then ran out of the house to a neighbor to get help. *Id.* at 822. He

24  then returned home and called police from the kitchen. *Id.* at 822-23. While waiting for police,

25  petitioner told Meredith that he held and shook his wife. *Id.* at 823.

26  At some point in the interview, petitioner told Detective Meredith that he had actually

27  gone gambling the previous night (rather than to trucking school, as he had previously said and as

28  he had told his wife). *Id.* at 824. At the casino, he lost the $1000 he had borrowed from Mr.

20

Niles.  *Id.* at 824-25.  He had previously intended to use the money for trucking school or give the money to Cynthia to pay some bills that had been late and/or had been paid but the checks had bounced.  *Id.*  He expected that Cynthia would be angry to learn of the gambling loss, because he was unemployed and the couple had money problems.  *Id.* at 825.  He had not planned to tell her about it until the weekend.  *Id.*

During the investigation, Meredith drove to Marion Coleman's residence in Napa.  *Id.* at 827.  The drive took 27 minutes.  *Id.*

During the questioning, Meredith lied to petitioner as an interrogation tactic.  *Id.* at 840.  He told petitioner a number of times that the Department of Justice had a "high-speed spray" on petitioner or his clothes that linked him to the murder.  *Id.*  Nevertheless, petitioner never admitted to having murdered his wife.  *Id.* at 850.  He gave consent to have his house and vehicles searched.  *Id.* at 851.

During the trial, Detective Meredith drove the route through Vallejo that petitioner told him he took the morning of the murder.  *Id.* at 1041.  He went from the Stringer home to the animal shelter, then to the donut shop, on to the sign shop and then petitioner's mother's house, and back to Boggs Court.  *Id.* at 1041-42.  At each location, he stopped only long enough to record his mileage.  *Id.*  He drove the route around noon, and traffic was normal.  *Id.* at 1041.  The trip was 10.2 miles and took 29 minutes.  *Id.*  Detective Meredith believed traffic would be a bit lighter earlier in the morning.  *Id.* at 1048.

Detective Bennigson, of the Vallejo Police Department, arrived at the crime scene at about 10:36 on the morning of the murder.  *Id.* at 513, 517.  He looked around the house for signs of forced entry, but found none.  *Id.* at 514-15.  The house was neat and clean with no evidence of ransacking.  *Id.* at 515.  He found no weapons in the home.  *Id.*  Cynthia's body was in a sitting position in the kitchen with her head leaning forward.  *Id.* at 525.  She had an obvious head wound, and there was a lot of blood on the lower, left-hand side of her.  *Id.*  Blood was spattered behind her on the cabinets and ceiling and a washer and dryer nearby.  *Id.* at 525-26.  Red foam that was not moving and appeared hard came from her mouth.  *Id.* at 526.  Bennigson took some
/////

21

1   photos.  *Id.*  He recalled that someone seized the tape from the house's answering machine as

2   evidence.  *Id.* at 520.  The body was removed around 9 p.m.  *Id.* at 536.

3         Bennigson observed the autopsy of Cynthia's body and transported the rape kit, clothing,

4   fingernail clippings, and blood sample to the police department evidence room.  *Id.* at 515-16.

5   Another detective later transported the rape kit, clothing, and sample of Cynthia's blood to

6   Caroline Garcia at the Department of Justice.  *Id.* at 516.

7         Caroline Garcia, a criminalist for the California Department of Justice, testified as an

8   expert for the prosecution.  *Id.* at 759-60.  She participated in the analysis of the crime scene on

9   the day of Cynthia's murder and authored the field investigation report for the case.  *Id.* at 760.

10  She examined the inside and outside of petitioner's truck and the outside of Cynthia's car.  *Id.* at

11  760-61.  She found no blood on the truck.  *Id.* at 761.  She found no blood or shoeprints in the

12  carport.  *Id.*  She took a number of items from the home back to the Department of Justice lab.  *Id.*

13  From the front door, Garcia took what appeared to be a blood stain on the metal base of the

14  doorway as well as a "control" (an area near the apparent blood stain where no stain appears).  *Id.*

15  at 761-62.  From the entranceway, she took photos of what appeared to be shoeprints.  *Id*. at 762.

16  She examined the house for signs of forced entry and found none.  *Id.*  Aside from the kitchen,

17  the house was neat and orderly.  *Id.* at 763.  Garcia saw no signs of a struggle or ransacking.  *Id.*

18  She noted that Cynthia's purse looked as if it had not been gone through, like nothing was

19  missing.  *Id.*  She collected numerous items from the living room and kitchen, including "lifts"

20  from Cynthia's body (using tape to lift trace evidence).  *Id.* at 764-66.  She obtained blood

21  samples for Cynthia and petitioner, showing that Cynthia was type B and petitioner was type O.

22  *Id.* at 766-67.

23        Faye Springer was Garcia's partner at the Department of Justice.  *Id.* at 156.  She testified

24  as an expert for the prosecution.  *Id.*  She processed the crime scene on April 28, 1995 with

25  Garcia.  *Id.* at 159.  They arrived in late afternoon, after waiting for a search warrant to be signed.

26  *Id.*  Detective Meredith gave them petitioner's blood sample, clothing, watch, wedding ring, and

27  shoes.  *Id.* at 160.  A detective Bartlett later provided Cynthia's blood sample, clothing, fingernail

28  clippings, and sexual assault kit.  *Id.* at 161.  She tested the items in the sexual assault kit for

1   seminal fluid and found none.  *Id.* at 162.  Springer examined petitioner's clothes.  *Id.* at 163.

2   The clothes had blood smears and soaking type blood stains.  *Id.*  Petitioner's sweatshirt had no

3   blood spatters.  *Id.* at 165.

4        Based on the spatter around Cynthia's body, Springer opined that she had been

5   bludgeoned in the kitchen.  *Id.* at 168.  She saw no signs of struggle.  *Id.*  She opined that Cynthia

6   was standing when she was first struck, because of the arterial spurting spatter on the upper

7   cabinets and ceiling.  *Id.* at 169.  Spatter on the lower cabinets indicated that she was attacked

8   with additional blows once she slumped from the initial blows.  *Id.* at 180.

9        Springer did not believe that the sweatshirt police took from petitioner was worn by

10   Cynthia's assailant, unless it had been shielded in some way, because it lacked the type of blood

11   spattering found around her body.  *Id.*  The blood smears on the sweatshirt were consistent with

12   petitioner leaning over the body.  *Id.*  The smearing, soaking, and droplet patterns on petitioner's

13   pants were also not of a type that Springer would expect on the assailant.  *Id.* at 172.  Instead, she

14   would have expected blood spatters on the upper part of the pants.  *Id.*  The blood stains on

15   petitioner's shoes could have come from the assault but also could have come from petitioner's

16   interaction with the body after death.  *Id.* at 173.

17        Springer found two towels with a small amount of blood on them inside the Stringer

18   washing machine.  *Id.* at 174.  Two stains from the towels were tested; one was inconclusive and

19   the other tested as type B human blood.  *Id.*  She also found some blood stains trailing from the

20   kitchen into the living room and on the arm rest of the living room couch, which could have come

21   from police leading petitioner from the kitchen into the living room.  *Id.* at 175.

22        Springer described four shoe prints found at the scene.  *Id.* at 184.  One she believed came

23   from Officer Silva's shoes.  *Id.*  Another had a "vibrum" sole, which could be found on many

24   shoes but was associated with work boots.  *Id.*  Some of the firemen on the scene had such work

25   boots on.  *Id.*  A third pattern was similar to petitioner's shoes, and a fourth pattern did not match

26   anything Springer had, after photographing the soles of all the individuals who had worked at the

27   scene.  *Id.* at 184-85.  She did not know where the fourth shoe print came from.  *Id.* at 184.  The

28   prints were all partial, and Springer could not be absolutely sure that they came from shoes.  *Id.* at

184-85.  She would expect the assailant to have blood spatter on his front, arms, hands, particularly from the waist to the head.  *Id.* at 225.

Springer found no blood on petitioner's truck, inside or outside.  *Id.* at 187.  She found no blood or shoeprints in the carport, either.  *Id.*  No blood was found on the gate, in the bedrooms, or in the bathrooms.  *Id.* at 194-95.

Latent fingerprint analyst Tom Crosby testified as an expert for the prosecution.  *Id.* at 698-99.  He examined the crime scene for fingerprint evidence on April 28, 1995, including most of the residence and the outside of Cynthia's Toyota.  *Id.* at 699-700.  He concentrated on the kitchen and living room.  *Id.*  Crosby did not take any lifts off the small, wood, walk-through gate outside the home's entrance, the metal grate at the entrance, or the door that went into the backyard area.  *Id.* at 719-20.  He did examine the doors, but believed he found nothing to process on them.  *Id.* at 720-22.  He found latent fingerprints on the phone in the living room, some kitchen cabinets, the phone in the kitchen, a coffee table in the living room, a picture frame in the living room, and the car.  *Id.* at 701.  He also examined various items given to him by the Department of Justice for analysis and found latent prints.  *Id.* at 704-05.

Crosby submitted some of those latent prints, which he could not identify, to Automated Latent Print System for comparison with a database of prints.  *Id.* at 705-10.  That system did not identify the prints.  *Id.* at 747.  The unidentified prints were lifted from the kitchen cabinet above the microwave, the living room frame, the hood of Cynthia's car, and two coupons.  *Id.* at 730-41.  Crosby did not attempt to match them because he was not provided prints for comparison for anyone other than petitioner.  *Id.* at 741, 747.  Crosby identified 48 of the latent prints, found on 19 items, as matching petitioner.  *Id.* at 711-13.

Crosby testified that prints could last a long time on an undisturbed surface, depending on a host of environmental factors and the type of surface.  *Id.* at 741-43.  It is virtually impossible to determine when a print was placed on a surface.  *Id.* at 746.  It is possible to touch a surface without leaving a print, even if the surface is conducive to prints.  *Id.* at 743.

Forensic pathologist Dr. Arnold Josselson testified as an expert for the prosecution.  *Id.* at 670-72.  He performed an autopsy on Cynthia's body at 1:45 p.m. on April 29, 1995 (the day

1  after the murder).  *Id.* at 672.  He concluded that she had died from blunt force injuries to the

2  head.  *Id.* at 673.  He could not determine the kind of blunt instrument used to bludgeon Cynthia

3  nor the height and weight of her attacker.  *Id.* at 684, 694.  He described her head injuries in

4  detail, but could not determine whether she had been hit from the front or behind.  *Id.* at 673-77,

5  684.  He examined the body for other injuries but did not find any, other than a small bruise on

6  the face.  *Id.* at 677, 684.  She was wearing jewelry and her pager when she died.  *Id.* at 678.  He

7  was familiar with the phenomenon of rigor mortis and described it as a chemical reaction in

8  muscles after death that makes them contract and feel stiff to the touch.  *Id.* at 679-81.  The

9  stiffness begins two to four hours after death, becomes complete between six and 12 hours after

10  death, starts to disappear after 24 hours, and is usually completely gone after 36 hours.  *Id.* at 679.

11  Those numbers were not absolute, however, as factors such as the condition of the decedent prior

12  to death and the environment could speed or slow the process.  *Id.* at 679-80, 686.  If rigor mortis

13  set in to Cynthia's body at some time after 10:15 a.m. on the morning of her death, it should have

14  also been present at 7:30 p.m. the same day.  *Id.* at 689.  Josselson made no attempt to determine

15  the time of Cynthia's death.  *Id.* at 693.  He noted no factors in Cynthia or in the environment in

16  which her body was found that would alter the usual timeframe for rigor mortis.  *Id.* at 695.

17  Josselson also described algor mortis as the cooling of a body after death.  *Id.* at 681.  He

18  testified that, in the first hour after death, the temperature of a body increases a little bit.  *Id.*

19  After that, the temperature generally decreases at a rate of 1.5 degrees Fahrenheit per hour,

20  subject to variations caused by factors such as the condition of the decedent prior to death and the

21  environment.  *Id.*  Extremities begin to cool immediately upon death.  *Id.* at 694.  To get a proper

22  measure of the temperature of the body, a person would have to use some method other than just

23  touching an extremity, because the temperature sensed by touching an extremity would be

24  influenced by the temperature of the person touching and other factors.  *Id.* at 692-93.

25  Dr. Paul Hermann was called by the defense as an expert in forensic pathology.  *Id.* at

26  994-97.  Generally, he said, rigor mortis sets in about two to four hours after death, but the time

27  can vary widely.  *Id.* at 998.  The stiffness then remains for about 36-48 hours and then

28  disappears, although that time can vary widely as well.  *Id.* at 998-99.  Hermann was certain that

Cynthia's body could not have gone through the entire rigor mortis cycle (from stiff back to soft) in the time between her departure from the Niles' home and the discovery of her body.  *Id.* at 999-1000.  He testified further that, if the body was undergoing rigor mortis at 8:30 p.m. on the date of the murder, it was also certainly in rigor mortis at 7:30 p.m.  *Id.* at 1000.  It was possible that Cynthia died between 8:50 a.m. and 10:15 a.m. that morning, but also possible that the death occurred between 7:50 and 8:50 a.m.  *Id.* at 1001, 1009.  The fact that Officer Silva thought Cynthia's hand was cold upon discovering her body was not particularly probative of her time of death and not inconsistent with her having died between 8:50 and 10:15 a.m.  *Id.* at 1001-03.

Hermann testified that blood coagulates in about a minute, but this rate varies person-to-person.  *Id.* at 1004.  The more blood there is, the longer it will take for its coagulation to be noticeable.  *Id.*  It is not possible to say in any given case how soon after death the blood will start to coagulate, as the rate of coagulation is impacted by many variables.  *Id.* at 1007.  If Cynthia had been killed between 8:50 and 9:15, it would be possible for the blood to begin noticeably coagulating at 10:15.  *Id.* at 1007-08.  It would also be possible for the blood to begin noticeably coagulating at that time if she had been killed between 7:50 and 8:50.  *Id.* at 1009.

Sherrell Powell worked with petitioner in 1993 and 1994 at the Austin Creek Apartments in Vallejo.  *Id.* at 278.  She lived at the apartments until 1995.  *Id.* at 279.  Petitioner was a maintenance man there.  *Id.*  Powell reluctantly testified that petitioner had once jokingly said to her, "Sherrell, you know everybody in Vallejo.  Do you know anybody I could get to kill Cynthia for $1000?"  *Id.* at 280-82, 285.  Petitioner had told Powell he was unhappy with Cynthia and wanted to divorce her because she did not want to have kids.  *Id.* at 283-24.  Powell told the investigator that she had been on crack for five days when she told police about petitioner's incriminating statements.  *Id.* at 287.  She testified at trial that she had been lying to the investigator, however, so as not to appear a "snitch."  *Id.*  Powell had also lied on part of her job application for the Austin Creek Apartments.  *Id.* at 293-94.  She had never seen petitioner beat up anybody.  *Id.* at 340.  He was nice to her.  *Id.*  Defense investigator T.J. Hicks testified that Powell told him that petitioner had told her he loved Cynthia.  *Id.* at 783.

/////

Allen Ames lived at the Austin Creek Apartments and befriended petitioner there. *Id.* at 350-51.  During the two years before Cynthia's murder, petitioner had expressed both positive and negative feelings about his marriage to Ames. *Id.* at 351-53.  Petitioner was upset that Cynthia did not want to have children or pursue custody of Mary Lee because he wanted to benefit from a tax deduction related to her. *Id.* at 353-54.

Pacita Lee moved into the Austin Creek Apartments in 1992. *Id.* at 558.  She lived there for three years and also worked as the assistant manager, and she knew petitioner. *Id.* at 559.  She last saw petitioner in September 1994. *Id.* at 560.  When they worked together at the apartment complex, she saw him every day. *Id.*  Petitioner told her many times that he wanted to divorce Cynthia because she did not want to have children. *Id.* at 560-61.  Three times, petitioner talked about his wife ending up dead, joking that if she died he could have the insurance money. *Id.* at 561-62.  On one occasion, Lee and her husband got drunk with petitioner in their kitchen. *Id.* at 563.  He became upset about Cynthia, cried, and punched the oven. *Id.*  On other occasions, petitioner told Lee that he loved his wife. *Id.* at 574.  Once, petitioner approached Lee and cautioned her that Sherrell Powell would tell her that petitioner had asked Powell if she could find someone to kill his wife for $1000, but that Lee should not trust Powell. *Id.* at 586-87.

Mr. Hicks testified that Lee told him that petitioner had never said he wanted his wife dead and that she was not present when petitioner discussed hiring someone to kill his wife with Powell. *Id.* at 783-84.

Elsa Peregrina also worked with petitioner at the apartment complex in 1994 and before. *Id.* at 615-16.  She saw him every day and considered him a friend. *Id.* at 617.  She last saw him about a year and a half before the murder. *Id.* at 620.  The day after petitioner told her he was getting a large amount of life insurance on Cynthia, he asked Peregrina how he could get rid of Cynthia. *Id.* at 618-19.  He then said, "If something happened to her, you would never believe I didn't do it, Elsa?" *Id.*  Petitioner made jokes about getting rid of his wife often enough that Peregrina did not take his comments seriously. *Id.* at 624-25.  During their friendship, he voiced complaints about Cynthia; that she was no fun and didn't want children. *Id.* at 619.

/////

1   She advised him to divorce Cynthia, but he wouldn't do it. *Id.* at 620. Mr. Hicks testified that

2   Peregrina told him that she had never said that petitioner wanted to get rid of Cynthia. *Id.* at 785.

3   Debra Appel worked at the apartment complex with petitioner in 1991 for about a year

4   and kept in touch with him afterward. *Id.* at 1059. Petitioner told her many times that he was not

5   happy in his marriage. *Id.* at 1060. In one instance, petitioner told Appel that he wished he could

6   find a way to do away with Cynthia, fix her brakes or something like that, because they had been

7   arguing. *Id.* at 1061. She responded by telling petitioner, "That's not very funny." *Id.* He

8   replied, "I know. Now if something happen[s] to Cynthia you would think I did it." *Id.*

9   Arora Angeles sold the Stringers an insurance policy on Cynthia's life in 1991 with a

10   payout of $100,000. *Id.* at 487-88. The policy was active at the time of Cynthia's murder and

11   benefitted petitioner. *Id.* at 489-90. Although petitioner had some historical health problems,

12   Angeles was willing to try to obtain insurance for him as well. *Id.* at 499-501. Ms. Angeles

13   testified that petitioner was not interested. *Id.* In the month after Cynthia died, Angeles sent

14   petitioner a claim form, but he did not return it. *Id.* at 501-02. The prosecution later stipulated,

15   however, that petitioner did return the form and obtain a $50,000 policy naming Cynthia as his

16   beneficiary that was maintained through the date of her death. *Id.* at 1086-87.

17   Mary Lee Lagrosa was Cynthia's niece. *Id.* at 596. In April 1995, she was in sixth grade,

18   and her school-day began at 8:35 a.m. *Id.* at 598. Cynthia generally took her to school, but if she

19   was not able to, Mary Lee's father would take her. *Id.* On April 28, 1995, Mary Lee called

20   Cynthia's house around 8:25 or 8:30 a.m. *Id.* at 600, 607. Mary Lee was running late; usually

21   Cynthia picked her up at around 8:15 or 8:20. *Id.* at 607. Petitioner answered the phone and told

22   her Cynthia was running late and was still lying down. *Id.* at 600-01. His voice was quiet and

23   sad. *Id.* at 601, 613. Mary Lee had lived with the Stringers for three years and often spent

24   weekends with them. *Id.* at 610. She had never seen petitioner act violently toward Cynthia or

25   seen any marks of violence on Cynthia. *Id.* at 610-11.

26   Lynn Phorth owned Doughboy Donuts in Vallejo. *Id.* at 658. On April 28, 1995,

27   petitioner came there. *Id.* at 659. Surveillance footage and a receipt showed the time as 9:26 a.m.

28   *Id.* at 662, 669. He ordered a muffin and a donut, but had forgotten his wallet. *Id.* at 660, 665.

1    Because he was a regular customer, Phorth told him he could pay next time. *Id.* at 660-61.

2    Phorth did not notice anything unusual in petitioner's demeanor or any blood. *Id.* at 666-67.

3         Patrick Garrett was petitioner's brother-in-law. *Id.* at 314.  On the morning of the murder,

4    he was working at Sign Factory in American Canyon. *Id.* at 314-15.  Petitioner came there a little

5    before 10 a.m. *Id.* at 315.  Garrett saw no blood on petitioner. *Id.*  Petitioner appeared to be in a

6    good mood. *Id.* at 315-16.  Petitioner was driving his truck. *Id.*  Garrett noticed nothing unusual

7    about petitioner. *Id.*

8         Robin Garrett is petitioner's sister. *Id.* at 946.  According to Garrett, when petitioner was

9    being questioned by the police, she came to the station and asked repeatedly to see him. *Id.* at

10   952.  She left after an hour and a half because Detective Bennigson would not let her see

11   petitioner. *Id.* at 952-53.  Detective Meredith later drove petitioner to his mother's home, where

12   Garrett met him. *Id.* at 953.  Before Meredith left, petitioner reminded him that he had forgotten

13   to take petitioner's blood for a test. *Id.* at 955.  Garrett drove petitioner back to the station so he

14   could provide blood. *Id.* at 955-56.  While at the station, Meredith told Garrett to be careful not

15   to be alone with petitioner because he was dangerous. *Id.* at 957.

16        **IV.    Evidence Not Introduced at Trial**

17             **A.  DNA Evidence**

18        After his conviction, petitioner sought DNA testing in the Solano County Superior Court

19   pursuant to California Penal Code § 1405.  The state court granted his request, and ordered testing

20   for 30 items of evidence.  ECF No. 90 at 3; ECF No. 90-4.  The results were largely inconclusive

21   or unremarkable (most DNA appearing to have come from Cynthia), with two notable exceptions.

22   First, a "clump of red-brown debris which tested positive for blood" found underneath Cynthia's

23   left thumbnail (ECF No. 90-1 at 5) contained a "DNA mixture of one unknown fifteen-locus

24   major male DNA profile and low-level DNA types from at least one minor contributor."  ECF

25   No. 90-1 at 1.  Petitioner was excluded as the source of the "major male DNA profile" and as the

26   minor contributor. *Id.* at 9.  Second, two blood stains on a towel from the home's washing

27   machine were tested, and "[t]he DNA typing results provide strong evidence that Lonnie Stringer

28   [petitioner] is the source of the DNA detected" in those stains. *Id.* at 1, 9.  Notably, the washing

1   machine was located in the kitchen, where the murder occurred, and the towels also bore type B

2   bloodstains, Cynthia's blood type.  RT 174, 525-26, 766-67.  Petitioner makes no attempt to

3   explain the presence of his blood on the towel.

4   **B.  Evidence Related to Randy Russell**

5         In petitioner's first amended memorandum of points and authorities in support of his

6   habeas petition (ECF No. 11) and his first supplemental brief regarding factual innocence (ECF

7   No. 45), petitioner focuses on several items of evidence regarding his former brother-in-law,

8   Randy Russell, in an attempt to establish that Russell, not petitioner, committed the murder.  The

9   evidence itself is contained in declarations submitted in support of petitioner's state habeas

10   petition, copies of which are included in petitioner's exhibits to his supplemental brief (ECF No.

11   47) and summarized below.

12         Petitioner's mother, Anita Stringer, signed a declaration on November 29, 2005, detailing

13   her interactions with petitioner's trial and appellate counsel regarding various items of third-party

14   culpability evidence and the filing of a habeas petition.  ECF No. 47 at 34-39.  The declaration is

15   mostly relevant to petitioner's claim that his trial attorney rendered ineffective assistance of

16   counsel by failing to pursue a possible third-party culpability defense, rather than petitioner's

17   actual innocence claim, and tends to summarize evidence originating from other sources rather

18   than provide a direct account.  *Id.*  Anita did provide the following relevant facts, however:  Two

19   nights before Cynthia was killed, someone vandalized Anita's home.  *Id.* at 35.  The unknown

20   vandal painted black on all family photos except those depicting Crystal and Randy Russell and

21   spray-painted the words "death" and "daughter killer" on the walls and beds.  *Id.*  Nothing of

22   value was taken from the house.  *Id.*

23         Petitioner, in an unsigned declaration dated December 2005, echoed his mother's

24   declaration almost to the word.  *Id.* at 42-47.

25         Robin Garrett, petitioner's sister, signed a declaration on September 13, 2005 on behalf of

26   petitioner.  *Id.* at 65-67.  She averred that, on April 26, 1995, her husband Patrick Garrett called

27   her from petitioner's house.  *Id.* at 65.  He told her that Anita's home had been vandalized.  *Id.*

28   She went to Anita's home later that evening.  *Id.*  She could smell spray paint.  *Id.* at 65-66.

Pictures on the wall had been defaced.  *Id.* at 66.  The wall in the hallway had been spray-painted with the words "daughter killer."  *Id.*  Anita's room had been "completely destroyed," with all her personal items strewn on the floor and her expensive jewelry and credit cards left out in the open. *Id.*  All photos had been defaced except those depicting the Russell family and Robin's deceased father.  *Id.*  A small piece of window had been broken and "looked as if someone broke the window just enough to get a finger in and lift the handle of the window."  *Id.*

Petitioner's other sister, Crystal Russell (now Davis), declared on October 31, 2005, that, at the time of Cynthia's murder, she was separated from her husband, Randy Russell.  ECF No. 47 at 29.  Around 1991, Crystal decided to leave the Jehovah's Witnesses, which caused "a severe rupture in my family."  *Id.*  Petitioner refused to let Crystal in his home, and their mother, Anita, stopped talking to Crystal about anything other than business matters and emergencies.  *Id.* at 29-30.  Randy was also a Jehovah's Witness.  *Id.* at 30.  According to Crystal, "anyone who is not a [Jehovah's] Witness is among 'the walking dead.'"  *Id.*

On April 28, 1995, Randy came to Crystal's apartment at 5 a.m., but Crystal sent him away because it was too early.  *Id.*  He came back around 6:30 a.m. and borrowed the phone to call petitioner, because he planned to go to petitioner's house later that morning "so they could work things out."  *Id.*  Crystal averred that Randy called petitioner's home, but did not state whether he spoke to anyone there.

Randy drove their children to school at some point after 7 a.m.  *Id.*  Although their son, Michael, had expected Randy to pick him up from school, Randy had not done so.  *Id.*  Around 9:30 that evening, Randy returned to the Russell apartment, "extremely intoxicated."  *Id.*  He told Crystal that it should have been her who was murdered.  *Id.*  He was wearing brand new shoes although he rarely bought new clothing.  *Id.*  A few days later, their daughter Tammy disclosed to Crystal that Randy had driven to the Stringer home on the way to school on the morning of the murder and had stopped and stared at the house for a few minutes.  *Id.*

At the time surrounding the murder, Randy had a drinking problem.  *Id.*  He would drink large bottles of vodka in a single sitting, then hide the empty bottles and deny being drunk.  *Id.* He was often depressed and suicidal.  *Id.*  He often stared at people, and he would sit and stare at

the Russell home even before the couple separated.  *Id.* at 31.  Randy never hit Crystal but would sometimes block her from leaving the house and "push his way around."  *Id.*  He sometimes held a knife up to his throat as if to cut it.  *Id.*  At some point after Cynthia's murder, Randy's grandparents told Crystal that they had gone to the Stringer home on the day of the murder looking for Randy because Randy had told them he was there, but the house was taped off when they arrived.  *Id.*

Michael Russell declared on October 28, 2005:

> On or about the 27th of April, 1995, my father, Randy Russell, was driving me around Vallejo.  The reason that I recall the date is that it was the day before my Aunt Cynthia was killed.  While driving around, my father drove to my uncle Lonnie's home on Boggs Court.  We stopped at the corner of the street and my father stared at Lonnie's house for several minutes, then we drove off.  When we left, he said "I got to come back and talk to Lonnie."

*Id.* at 13-14.  In a second declaration authored on the same date, Michael Russell averred that, on or about October 17, 2004, Randy called and asked to be picked up.  *Id.* at 21.  Michael found him badly beaten and drove him to the house of Tammy Russell, Michael's sister.  *Id.*  Randy was clearly "under the influence" of an unspecified substance.  *Id.*  While the three waited for a medical team to arrive and treat Randy, he started talking about petitioner.  *Id.*  He said he knew petitioner did not kill Cynthia, but would not say who had killed her.  *Id.*  He kept repeating that he "knew too much."  *Id.*

Tammy Russell declared on October 26, 2005 that, on or about April 27th, 1995, her father had come to the family's apartment, drunk.  *Id.* at 17.  Her parents fought about his drinking, and her mother asked him to leave the apartment.  *Id.*  Randy left and slept in his car.  *Id.*  He returned the following morning, still drunk.  *Id.* at 18.  Nevertheless, her mother asked him to take Tammy and Michael to the bus stop at about 7 a.m.  *Id.*

The three Russells drove to Michael's bus stop first.  *Id.*  The bus was due at 7:30 but did not arrive until about 8:15 a.m., and Michael boarded it.  *Id.*  After Michael left, Randy "started talking angrily about my grandmother's house and the vandalism there."  *Id.*  He said he hated Crystal, his estranged wife, calling her a "whore" and a "slut."  *Id.*  He was sweating profusely and shaking.  *Id.*

On the way to Tammy's school, Randy stopped for gas and then drove to the Stringer house on Boggs Court. *Id.* There, he sat in his car and stared at the house for a couple of minutes. *Id.* He then said that no one was there and drove Tammy to school, dropping her off around 9 a.m. *Id.* Tammy asked Randy where he was going, because he was acting strangely. *Id.* He replied that he was returning to the Stringer house to talk to petitioner about the vandalism at Anita Stringer's house, and drove away just after 9 a.m. *Id.*

In a second declaration also authored on October 26, 2005, Tammy Russell averred that, on or about October 17, 2004, Randy had come to her house badly beaten. *Id.* at 25. He said he knew that petitioner did not kill Cynthia and that he knew who did, but that he could not tell anyone or else they would kill him. *Id.* He said he "knew too much." *Id.* at 25-26. When pressed, Randy claimed that he could not tell Tammy because he was afraid "of the Hell's Angels and their people." *Id.* at 26.

Patricia Rapson, an investigator for petitioner, signed a declaration for petitioner on December 5, 2005. *Id.* at 50-53. She averred that she had interviewed Sherell Powell over the telephone on July 9, 2005, and Powell told her that she could not remember what she had said at the preliminary hearing in petitioner's murder case "because she was high or had been high for many days leading up to the hearing." *Id.* at 51.

Rapson interviewed Randy Russell on July 29, 2005 in his car. *Id.* At the time, he was unemployed, disabled, homeless and participating in a drug and alcohol recovery program. *Id.* Randy told Rapson that he was at his (now deceased) mother's house in Clear Lake on April 28, 1995, the day of the murder. *Id.* He was "positive" that he had been there on that day because he remembered his mother's stunned reaction to the news of the murder. *Id.* As soon as he heard about the murder, he drove to Vallejo. *Id.*

Randy told Rapson that his children were mistaken about him being in Vallejo that day and driving them to school. *Id.* He remembered driving around with them, but not that morning. *Id.* He drove to the Stringer house after the murder to check out the scene; the house was cordoned off with police tape. *Id.* at 51-52.

/////

Randy further told Rapson that he does not know who killed Cynthia, although he remembered telling Tammy and Michael that he knew petitioner had not done it and knew who had done it but could not identify them out of fear.  *Id.* at 52.  Randy told Rapson that he had been talking about his theory of what had happened, rather than any facts or second-hand information. *Id.*  "He was just trying to put two and two together and came up with his theory" and had not said anything about the Hell's Angels.  *Id.*

Randy's theory, as related by Rapson, went like this: Cynthia was killed by someone who wanted to get back at petitioner and Cynthia "because of actions taken by them stemming from their beliefs as Jehovah's Witnesses."  *Id.*  The murder cast the family and the faith in a bad light, according to Randy, and he speculated that that may have been the murderer's goal.  *Id.*  Randy speculated that a cousin or uncle of Anita's had committed the crime.  *Id.*  He intimated that he knew the person, having met them at Crystal's house on one occasion, and described him as a man with tattoos all over his body.  *Id.*  Crystal had begun associating with this family member after having been kicked out of the church.  *Id.* at 53.  Randy suggested that the killer, angry with petitioner, had killed Cynthia, perhaps unintentionally when "things" got "out of hand."  *Id.* at 52.

Randy told Rapson that, some time after the murder, "Cynthia" (the court posits that the declarant meant to say "Crystal" here) received a phone message that said, "Are you glad this happened?" and that he thinks he recognized the voice as belonging to the uncle.  *Id.* at 53.  Randy said that he had inadvertently deleted the message.  *Id.*

Another investigator on the case, Manny Garcia, declared on November 8, 2005, that he had interviewed Randy's grandparents, Bob and Ruby Gainey, around July 21, 1995.  *Id.* at 56.  They told Garcia that Randy had called them around 11 a.m. on the morning of April 28, 1995 and asked them to pick him up at the Stringer home.  *Id.* at 56-57.  The Gaineys went there to find him.  *Id.* at 57.  No evidence submitted by petitioner suggests that Randy was located at the Stringer home or nearby.

Other than the evidence of things Randy said in 2005, most of this evidence was known to petitioner and his counsel at the time of trial.  Petitioner makes much of his lawyer's failure to pursue a third-party culpability defense centered on Randy Russell and based, in large part, on the

34

1    vandalism of his mother's house two days before the murder.  In fact, defense counsel specifically

2    and successfully sought to exclude evidence of the vandalism at Anita's house.  CT 80.

3    According to counsel's motion in limine, the prosecutor could argue that petitioner had

4    committed the vandalism "to create phantom suspects to blame for his wife's death two days

5    later."  *Id.*  In the same motion, counsel sought (and obtained) exclusion of testimony by Elsa

6    Peregrina that she believed petitioner had spray painted "Elsa is a nigger lover" in black spray

7    paint on a wall at the Austin Creek Apartments to deter her from reporting that she thought he had

8    stolen a cash box from the apartment complex.  *Id.*  (She had put the box in the maintenance room

9    and told petitioner where it was, but beyond that had no proof that he had taken it.  *Id.* at 73.).

10   Defense counsel was undoubtedly aware that such testimony would bolster the state's anticipated

11   argument that petitioner had done the vandalism at Anita's house.  The prosecutor agreed that the

12   evidence should be excluded as "a specific misdemeanor bad act of vandalism" and did not object

13   to its exclusion.  RT 8.  Such agreement may not have been so forthcoming had petitioner

14   attempted to convince the jury that Randy had committed the vandalism at Anita's house as a

15   precurser to his murdering Cynthia.[3]

16                    **C.   Other Evidence of Third-Party Culpability**

17          T.J. Hicks, another investigator for petitioner, declared on November 11, 2005, that he had

18   interviewed inmate Marcus Tucker in the Sonoma County Jail on August 7, 1996 (after petitioner

19   had been convicted).  *Id.* at 61.  Tucker told Hicks that his cousin, who he refused to identify, had

20   told him that he had seen a suspicious person walking down Boggs Court on the morning of the

21

22          [3] The trial court also granted defense counsel's motions to exclude testimony regarding
     petitioner's gambling activities and associated losses (other than the night prior to the murder),
23   his extra-marital affairs, and an incident in which he enlisted close friend Allen Ames to write a
     fake letter to Cynthia purporting to be from a boyfriend so that petitioner could confront her about
24   having had an affair.  CT 80-84; RT 77-80, 344-48.  Petitioner's counsel described the Ames
     letter to the court as follows: "He [Ames] claims that he, at my client's request, wrote out a letter
25   to my client's wife concerning certain of her private parts.  Supposedly the purpose was to show
     that the author knew that she had an affair herself."  RT 77.  The prosecutor told the court his
26   understanding of the Ames letter as a request made "to a good friend" (Ames) "that he write a
     letter which would appear to be a love letter from a suitor, from a boyfriend to Mrs. Stringer. . . .
27   Mr. Stringer would pretend to find [the letter] at her house and confront [her with] it as some kind
     of sign of her infidelity."  *Id.* at 78.
28

                                                    35

1  murder. *Id.* Hicks contacted Tucker again on August 14, 1996. *Id.* at 62. Tucker told Hicks that

2  he had spoken with his cousin and the cousin did not wish to get involved. *Id.* He refused to

3  speak further with Hicks, and Hicks served him with a subpoena to appear in court. *Id.* Hicks

4  discovered that Tucker had lived near the Stringer house, at the corner of Echo Summit and

5  Meadows Drive, at the time of the murder. *Id.*

6      Petitioner presented his and his investigator's interactions with Marcus Tucker to argue

7  for a new trial. *Id.* at 200-24. He informed the court that Tucker had approached him in the jail

8  and told him that his cousin had seen a suspicious man in the driveway area of the Stringer home

9  about the time of the murder. CT 201. The state responded that Tucker had informed the district

10  attorney's office that petitioner had offered him a $20,000 reward for information leading to

11  Cynthia's killer, and that Tucker had made up his story hoping to receive the reward. CT 233-34.

12  The district attorney's investigator's account of his conversation with Tucker to this effect

13  appears in the Clerk's Transcript at pages 260-61.

14      The court heard testimony from Tucker, who testified that he had, in fact, lived near

15  Boggs Court at the time of the murder. RT 1241-42. He approached petitioner in the jail because

16  he had heard about the reward money.[4] *Id.* at 1242. After petitioner confirmed for Tucker that

17  the reward offer was genuine, Tucker told petitioner that he might know something. Tucker then

18  went to a phone while in the petitioner's presence and faked a call to fool petitioner into believing

19  that Tucker actually knew someone who had information. *Id.* Tucker also lied to petitioner that

20  he "knew a female who saw somebody around the neighborhood at the time the murder

21  occurred." *Id.* at 1244. Tucker also lied to petitioner's investigator, Hicks. *Id.* at 1245-46. He

22  hoped to say something "strong enough" so that he could get some money out of petitioner, but

23  backed out when pressed by Hicks. *Id.* at 1257. After lengthy questioning by defense counsel,

24  the trial judge concluded that Tucker had no valuable information, but had just been "playing a

25  little game on [petitioner] and [his] investigator." RT 1262. The court denied the motion for new

26  trial. RT 1270.

27      _____

   [4] Neither petitioner nor Tucker could pin down the date of their first interaction, although

28  Tucker placed that interaction as occurring around six weeks after his incarceration began on July
   4, 1996. RT 1239-40, 1264.

1    Petitioner relatedly relies on an anonymous letter received by the Vallejo Herald Times on

2    May 9, 1996 to point the finger at Marcus Tucker.  CT 245.  The letter stated:

3         I'm writing to lesson [sic] the burden of my conscience concerning the death of
          Cynthia Stringer.  She was a friend of mine, she would visit me and read the bible
4         to me on many occasions.  May her soul rest in peace.  There been many rumors
          in the neighborhood about what happen [sic] that day.  I don't know all the
5         details, but recently I heard something that was very upsetting to me.  I heard that
          it was a young man name [sic] Mark.  Apparently he was watching Cynthia that
6         morning with the intention to rape her.  Cynthia splashed hot coffee on his face,
          that [sic] when he went crazy on her.  I heard that half his brains are burn up [sic].
7         He use [sic] to hang out at the house at the corner of Echo Summit and Meadows
          on the right side.  Doris knows more then [sic] me, she spoke to Cynthia that
8         morning.  She saw more the [sic] what she says.  She may deny it because she is
          afraid.  Thats [sic] one reason why she moved out of Vallejo.  Im [sic] also afraid
9         that is why Im [sic] writing.  I know I should tell the police but I dont [sic] want
          them to know who I am, plus I dont [sic] trust them that much.  A friend told me
10        to write to the newspaper and they would know what to do with this information.
          I pray to God that you do the right thing and relate this information to the
11        appropriate individuals.  Thank you.

12   CT 245.

13        In her declaration, Anita Stringer tried to associate the "Doris" mentioned in the

14   anonymous letter with Doris McKinney, who testified at trial under the name Doris McKinney

15   Price (see summary of trial evidence, *supra*).  ECF No. 47 at 36.  Officer Bennigson of the

16   Vallejo Police Department interviewed McKinney about the letter on June 11, 1996.  CT 263.

17   His memorandum dated the following day reflects that McKinney told him that "the letter was the

18   biggest lie she had ever heard.  The only person she was afraid of was Lonnie Stringer."  *Id.*  She

19   had never heard of a "Mark" living in that area and felt that Stringer had written the letter himself.

20   *Id.* at 264.  She moved from Vallejo for economic reasons, not because she felt fear stemming

21   from Cynthia's murder.  *Id.*

22                  **D.   Untested Fingerprint and Other Evidence**

23        Petitioner consistently points to certain untested items of evidence – "fingerprints, palm

24   prints, hair samples and clumps of hair, and at least one footprint" (ECF No. 45 at 29) – from the

25   crime scene as cause to question his conviction.  *See* ECF No. 11 at 33, 48; ECF No. 45 at 4, 29-

26   30; ECF No. 95 at 16.[5]  In his first supplemental brief, petitioner explicitly asked the court to

27        ───────────────
          [5] Review of the record reveals that the "at least one footprint" is actually a single partial
28   print that criminalist Faye Springer testified "could have" come from a shoe.  RT 191.  The "palm
     print" is a "bloody smudge," according to fingerprint analyst Tom Crosby, that he would have

1   order state authorities to process this evidence in various ways.  ECF No. 45 at 29.  Petitioner's

2   request warrants quoting in full to show its brevity, vagueness, and total lack of legal argument

3   and authority:

> As previously noted, there were a number of items of evidence found that do not
> match any of the individuals associated with the crime, or any of the investigators
> at the scene.  This includes fingerprints, palm prints, hair samples and clumps of
> hair, and at least one footprint.  At this time, no DNA testing has been done on the
> hair, and it does not appear that the fingerprints of [sic] been run through the
> available data bases to see if they match any currently known individuals.  Thus,
> petitioner respectfully request [sic] that this court order the following:
>
> 1.      That the Attorney General's office be ordered to conduct DNA testing of
> the air [sic] samples, and to run them through available databases to determine if
> they match any currently known individuals, and to produce the results of all such
> test and analyses.
>
> 2.      That the Attorney General's office be ordered to run the currently
> unidentified fingerprints through all available databases in order to determine if
> they match any currently known individuals, and to produce the results of all such
> analyses.
>
> 3.      That following the testing referred to in number one, above, that the hair
> samples be turned over to the defense for testing by an independent expert, and
> that if different conclusions or information is obtained, that those results then be
> run by the Attorney General's office through all available databases to determine
> if the findings match any currently known individuals, and to produce the results
> of all such analyses.
>
> The testing referred to herein is crucial to evaluating the factual innocence claims,
> and the data bases for fingerprints and DNA are available only to the People.
> Thus, although the defense obviously could hire an expert and conduct DNA
> testing (assuming the hair is ordered produced), Petitioner does not have the
> resources to run the results through the types of data bases that are exclusively
> available to the government.  Accordingly, Petitioner respectfully requests that the
> Court make the requested order and defer ruling on this issue pending the
> outcome of the testing.

21   *Id.* at 29-30.  The government's response to the request was even briefer: "Petitioner does not

22   provide authority for such orders.  We are aware of no such authority."  ECF No. 48 at 4.

23          The undersigned initially declined to entertain the request absent some argument or

24   authority supporting it, which was petitioner's obligation to provide.  *Earp v. Davis*, 881 F.3d

25   1135, 1142-43 (9th Cir. 2018) ("A habeas petitioner … is not entitled to discovery as a matter of

26   ordinary course.") (internal citations and quotation marks omitted).  Under the Rule 6(a) of the

27   ────────────────────
    examined and photographed if it had value for making latent impressions.  RT 734.  As he did not
28   photograph the smudge, Crosby concluded he must have determined that it did not have such
    value.  RT 735.

1   Rules Governing § 2254 Proceedings in the United States District Courts, petitioner was

2   obligated to show good cause for the discovery he seeks.[6]  Good cause exists under that provision

3   where a petitioner shows that he "may, if the facts are fully developed, be able to demonstrate that

4   he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (internal quotation marks

5   omitted).  To meet this standard, the petitioner must support his request for discovery with

6   specific factual allegations.  *Id.*

7        A court's denial of a discovery request constitutes an abuse of discretion if the discovery

8   is indispensable to a fair, rounded, development of material facts, but discovery requests based on

9   "bald assertions and conclusory allegations" should be denied.  *Earp*, 881 F.3d at 1142-43.

10       Petitioner's request is not supported by specific factual allegations.  He does not identify

11  the fingerprint or hair evidence he wishes to have tested, leaving to the court the task of sifting the

12  record to find references to these items.  He also leaves the court to speculate how the requested

13

14       [6] Courts have grappled with the effect of *Cullen v. Pinholster*, 563 U.S. 170 (2011), on
discovery requests in habeas cases.  *See Coddington v. Martel*, No. S-01-1290 KJM CKD, 2013
U.S. Dist. LEXIS 142160, at *13-18 (E.D. Cal. Sep. 30, 2013).  In a case not directly on point,
the Ninth Circuit has indicated that *Pinholster*'s restrictions on the presentation of new evidence
in federal habeas proceedings is limited to the consideration of claims on their merits, and not to
the consideration of whether a petitioner has made the showing required to overcome a
procedural barrier to consideration on the merits.  *Dickens v. Ryan*, 740 F.3d 1302, 1320-21 (9th
Cir. 2014) (en banc).  In *Dickens*, the court held that 28 U.S.C. § 2254(e)(2) and *Pinholster* did
not prevent a petitioner from obtaining an evidentiary hearing to support his claim that there was
cause for his procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012).  At least one district
court in the Ninth Circuit has construed *Dickens* to hold that "[t]he strict statutory restrictions on
presenting new evidence in federal habeas proceedings do not apply to requests for discovery to
show actual innocence to excuse a claim's procedural default."  *Johnson v. Gentry*, No. 4:14-cv-
00395-CWD, 2019 U.S. Dist. LEXIS 161003, at *64-65 (D. Id. Sep. 18, 2019).  While *Dickens*
did not explicitly so hold, many district courts have similarly found *Pinholster* inapplicable to
requests for discovery and/or evidentiary hearings to gather evidence in support of a *Schlup*-
gateway procedural claim.  *E.g.*, *Skatzes v. Warden*, No. 3:09-cv-289, at *66 (S.D. Ohio June 1,
2017); *Yaag v. LeGrand*, No. 3:14-cv-00295-MMD-WGC, 2016 U.S. Dist. LEXIS 156222, at
*22-25 (D. Nev. Nov. 10, 2016); *Jackson v. Jones*, No. 14-CIV-22527-COOKE, 2016 U.S. Dist.
LEXIS 124219, at *28-29 (S.D. Fla. Sep. 12, 2016); *Riva v. Ficco*, Civ. A. 01-12061-MLW, 2014
U.S. Dist. LEXIS 116302, at *58-59 (D. Mass. Aug. 21, 2014).  The undersigned finds that these
courts have reached a reasonable harmonization of *Pinholster* with *Schlup*, which itself arose out
of a request for an evidentiary hearing and was remanded to the lower court due to the "fact-
intensive nature of the [actual innocence] inquiry, together with the District Court's ability to take
testimony from the few key witnesses if it deems it advisable."  *Schlup*, 513 U.S. at 331-32.
Accordingly, the undersigned views *Pinholster* as no bar to petitioner's request.

1 processing of evidence would shore up his claim of actual innocence.  He has utterly failed to

2 meet his burden of establishing good cause for his request.

3 Nevertheless, the undersigned has performed the required sifting and the necessary legal

4 research and concludes that there is not good cause in this case to require production or further

5 processing of the hair and fingerprint evidence.

6 Let's start with the untested hair evidence.  From what the court can gather from the

7 record, this evidence consisted of a hair hanging from a cabinet surface in the kitchen and several

8 "chunks or clumps" of hair found near the victim.  RT 203, 215-16, 224.  Criminalist Faye

9 Springer testified that she had no doubt that the chunks came from the victim as parts of her scalp

10 were cast off the weapon during the bludgeoning.  RT 224.  Petitioner has provided the court with

11 no reason to believe that the hair on the kitchen cabinet (at the murder scene) was from someone

12 other than the victim as well.

13 As for the fingerprints, only one was located in the kitchen.  This fingerprint, taken from

14 the kitchen cabinet above the microwave, could have come from any person who touched the

15 cabinet over a long period prior to the murder.  Latent fingerprint analyst Tom Crosby testified

16 that it is virtually impossible to determine when a print was placed on a surface and that prints

17 can last decades.  RT 746.  Petitioner does not claim that the kitchen was used exclusively by

18 himself and Cynthia such that no innocent third-party fingerprints could plausibly exist there.

19 Similarly, the second unidentified print was located on the hood of Cynthia's car (RT 730-41), a

20 place that not only could plausibly have been touched by numerous innocent third parties but had

21 earlier that day been touched by Officer Silva.  RT 414-15.  Petitioner has apparently made no

22 effort to eliminate Silva as the source of this print, and Crosby did not run the prints against

23 anyone other than petitioner and the database.  RT 741, 747.

24 The remaining unidentified prints were located on a frame in the living room and on two

25 coupons.  Petitioner provides no reason to believe that these items were likely to be touched by

26 the killer, and neither were found in the kitchen, where the murder occurred.  Petitioner's only

27 argument for innocence that the court finds remotely plausible (see below) is his claim that Randy

28 Russell was likely to have committed the murder.  But even if one or more fingerprints matched

1    Russell, this fact is of little assistance to petitioner's argument.  Russell was petitioner's brother-

2    in-law, and petitioner makes no claim that he had not been in the Stringer home on prior

3    occasions (on which he, like any house guest, may have touched common items like a picture

4    frame or cabinet).[7]  *See United States v. Lang*, No. CR S-93-0472 DLJ DLB, 2007 U.S. Dist.

5    LEXIS 79375, at * 49-50 (E.D. Cal. Oct. 25, 2007) (finding that the integrity of a trial had not

6    been undermined by the failure to inform the jury of evidence of untested fingerprints because

7    defense counsel emphasized that it is not possible to determine when or why a fingerprint is left

8    on an item and because fingerprints of unidentified persons would be expected on common

9    items).  Compared to these few unidentified prints, petitioner's prints were identified on 48 latent

10   impressions left at the scene.  RT 711-13.

11        This court has already indulged petitioner's stay requests, delaying the resolution of this

12   case by years, so that petitioner could obtain further forensic testing through the state's post-

13   conviction DNA-testing procedures.  That testing has not supported petitioner's claim of a third-

14   party killer, and instead has further implicated petitioner.  Petitioner's request for testing of the

15   few unidentified latent prints and hair evidence (likely originating from the victim) appears to the

16   undersigned as a further fishing expedition; lacking the compelling evidence of innocence needed

17   to pass through the *Schlup* gateway (see below), petitioner seeks to further delay the case in the

18   hopes that this expedition will yield something helpful to him.  But habeas petitions are not

19   "meant to be [] fishing expedition[s] for habeas petitioners to explore their case in search of its

20   existence."  *Rich v. Calderon,* 187 F.3d 1064, 1067 (9th Cir. 1999).  Accordingly, the

21   undersigned again recommends that petitioner's request for an order compelling state officials to

22   conduct forensic testing and comparison on fingerprint and hair evidence be denied.[8]

23   ───────────────────

24        [7] For the reasons provided below, the undersigned finds petitioner's claims regarding
     Marcus Tucker to be highly implausible.  As there is no plausible reason to believe that Tucker

25   committed the murder, it is extremely unlikely that any further latent fingerprint analysis would
     implicate him.

26

27        [8] The undersigned notes that petitioner's request is not a traditional discovery request, in
     which one party seeks evidence in the possession of another party.  Rather, petitioner seeks to

28   compel another party to create new evidence through the analysis of existing evidence.  Several
     searches across the LexisNexis federal courts database fails to reveal a single federal habeas case

## E.  State Court Review of Petitioner's Claim of Innocence

In petitioner's state court collateral attacks, the Solano County Superior Court concluded that petitioner "may have" shown that his trial counsel provided ineffective assistance by failing to investigate possible involvement by Randy Russell and Marcus Tucker.  ECF No. 47 at 90.  Nevertheless, petitioner's evidence – the same evidence provided to this court – did not demonstrate that petitioner had been prejudiced by counsel's deficient performance:

> The evidence against "Mark" is that the letter might have been referring to a Marcus Tucker, who has a criminal history and who lived not too far from the murder scene.  The evidence against "Randy" Russell appears to be that he might have been responsible for an act of vandalism toward the Stringers that had been committed prior to the murder, that he had acted strangely leading up to the murder, that he had some fascination with the Stringers, that he asked his grandparents to pick him up from the Stringers' neighborhood at about the same time the police appeared on the scene, and that he may have had new shoes on later that night.  Russell's behavior may be deemed odd and suspicious, but no evidence has been presented actually linking Russell to the murder.
>
> Weighed against this weak evidence is the ample, if mostly circumstantial, evidence presented against Petitioner at trial.  This evidence included his "joking" threats to kill his wife, his potential access to the proceeds of his wife's life insurance policy, his failure to adequately and accurately establish his whereabouts during the potential time of the murder, his odd conduct on the morning of the crime, his initial lies to police about his whereabouts the prior evening and about some of his activities on the morning of the murder, the timing of the call with his niece on the morning of the murder combined with evidence that the victim had not died recently when authorities were summoned an hour and a half later, and the lack of evidence suggesting any forced entry or struggle.

---

in which such a request was granted under Rule 6 or any other federal legal theory.  The undersigned did locate several cases denying such a request.  *Lewis v. Ryan*, No. CV-17-00220-PHX-JAT (BSB),2017 U.S. Dist. LEXIS 216584, at *33-37 (D. Ariz. Sep. 22, 2017); *Scott v. Fink*, No. 1:11-cv-752, 2011 U.S. Dist. LEXIS 92822, at *4-14 (W.D. Mich. Aug. 19, 2011); *Rucker v. Norris*, No. 5:07cv00051 JWC, 2008 U.S. Dist. LEXIS 18878, at *77-93 (E.D. Ark. Mar. 11, 2008).  *See also Battle v. Delo*, 64 F.3d 347, 353-55 (8th Cir. 1995) (refusing petitioner's request to obtain serology evidence to analyze in hopes of supporting an actual-innocence-based excuse for procedural default because "[t]he actual innocence gateway is there to avoid fundamental miscarriages of justice, not to provide the opportunity for fishing expeditions and delay or . . . a second trial.").  *Cherrix v. Braxton*, cited in the order declining to adopt the prior findings and recommendations, did not grant such a request, but instead dealt with the court's authority to order state officials to maintain and produce DNA evidence (not to analyze it) and to provide a capital petitioner with funding under 21 U.S.C. § 848(q) to have the evidence tested.  131 F. Supp. 2d 756 (E.D. Va. 2001).  There is no claim in this case for funding under § 848(q) (it applies only in capital cases).  Nor does petitioner simply ask authorities to hang on to the evidence and provide it to him; he asks this court to order them to test it for him and run it through their databases.

1    *Id.* at 91-92.  The Court of Appeals agreed: "In specific regard to petitioner's primary third party

2    culpability argument [regarding Randy Russell], no reasonable probability of a more favorable

3    result exists in light of all the evidence, including the evidence of petitioner's guilt and evidence

4    that the victim was killed before the time she would have left her residence for her appointment,

5    while petitioner was present, and before the third party's supposed entry into the victim's

6    residence." *Id.* at 97.

7          **V.**      **Petitioner Has Not Met the High Burden to Show His Actual Innocence**

8        Consistent with the Supreme Court's instructions in *Schlup*, *House*, and *McQuiggin*, the

9    undersigned has weighed all of the above-summarized evidence and must now determine

10   whether, taking all of that evidence into account, it is likely that no reasonable juror would find

11   petitioner guilty beyond a reasonable doubt.  The undersigned is guided by *Schlup*'s direction on

12   the kind of evidence that can make such a showing: (1) exculpatory scientific evidence, (2)

13   trustworthy eyewitness accounts, and (3) critical physical evidence. 513 U.S. at 324.  *See also*

14   *Lee*, 653 F.3d 929, 945-46 (9th Cir. 2011) (Kozinski, J., concurring).

15        Petitioner has not presented exculpatory scientific evidence.  He argues that the new

16   evidence of the blood of an unknown man found under one of Cynthia's fingernails, when

17   considered along with the Randy Russell and Marcus Tucker evidence summarized above,

18   suggests his innocence.  But petitioner overstates his case when he says that the DNA evidence

19   "completely excludes him as a source in every single piece of evidence that was tested."  ECF

20   No. 90 at 9.  In fact, that evidence shows that blood stains that had not been tested at the time of

21   trial, taken from a towel found inside the home's washing machine, were from petitioner's blood.

22   Evidence at trial showed that other stains on the towel came from an individual with type B

23   blood, which was Cynthia's blood type.  RT 174, 766-67.  This evidence weighs in favor of the

24   jury's guilty finding.

25        Moreover, beyond the bare DNA results, petitioner provides the court with no further

26   context.  Thus, the court lacks the facts it needs to assess the gravity of the DNA results (e.g.,

27   expert testimony as to the amount of blood, the age of the blood, and the possibility that the blood

28   came from another source – say, one of Cynthia's patients – rather than the murderer).

1      Nor has petitioner submitted trustworthy eyewitness accounts that sufficiently undercut

2  the jury's verdict.  He has submitted a number of declarations of family members intended to

3  throw suspicion on Randy Russell, but none of these individuals were eyewitnesses to the crime

4  (as in *Schlup*) or to any confession by Russell (as in *House*).  While petitioner attempts to use the

5  vandalism of his mother's house as evidence that Russell committed the murder, there is no

6  evidence other than speculation that Russell committed the vandalism.  Instead, as petitioner's

7  trial counsel recognized, it is more than conceivable that petitioner, who was caring for the house

8  at the time, committed the vandalism in order to throw suspicion on Russell for the murder he

9  was planning to commit.  This possibility is bolstered by evidence that petitioner had similarly

10  vandalized the Austin Creek Apartments; in both instances the perpetrator used black spray paint

11  and wrote syntactically similar phrases ("daughter killer" and "nigger lover").

12      The declarations from Russell's ex-wife and children regarding his behavior on the

13  morning of the murder and years later also fail to provide sufficient proof of Russell's

14  involvement to meet the *Schlup* standard.  While Michael and Tammy aver that Russell drove to

15  the Stringer home that morning and stated his intent to return, there is no actual evidence that he

16  did return there.  Notably, neighbors, along with visitor Michael Tobey, testified that they saw no

17  unusual activity or cars during the window of time in which petitioner posits that the murder

18  occurred.  And while Russell's grandparents, now deceased, may have come to the neighborhood

19  that morning to pick up Russell, petitioner presents no evidence that they did so or that any other

20  person saw Russell there.  In addition, Russell himself denied having gone to the Stringer home

21  that day and offered only odd and vague speculation about who may have killed Cynthia.  It is

22  equally speculative to conclude that he purchased new shoes because his shoes were soiled from

23  the murder rather than for any other reason (petitioner's investigator apparently did not raise the

24  subject with Russell).  This evidence is far from the type of reliable witness testimony relied on

25  by the Supreme Court in *Schlup* and *House*.

26      Petitioner's evidence regarding Marcus Tucker is even less persuasive.  Tucker himself

27  testified under oath, and consistent with his prior statements to investigators, that he had lied

28  entirely to petitioner in an attempt to get some of the reward money petitioner was offering in

1   connection with the case.  The anonymous letter to the newspaper, which petitioner points to as

2   further evidence of Tucker's involvement, is contradicted by the evidence at the scene showing

3   no struggle (and no thrown coffee).  Doris McKinney, referred to in the letter, considered it "the

4   biggest lie she had ever heard" and believed that petitioner had written it.  In light of evidence

5   that petitioner had instructed his friend, Allen Ames, to author a fake letter to Cynthia (see

6   footnote 2, above), this belief is not unreasonable.  In any case, the letter's anonymity detracts

7   considerably from its credibility.

8          Petitioner has not presented any evidence falling into the third category identified by in

9   *Schlup* – critical physical evidence.

10         On the other side of the scale, significant evidence supports the jury's verdict.  Petitioner

11  had mentioned or joked about his desire to kill his wife, or have her killed, to several friends at

12  the Austin Creek Apartments.  These individuals recounting those statements harbored no

13  apparent animosity to petitioner and some of them only very reluctantly testified to these

14  unfavorable facts.  Petitioner had been lying to his wife that he had been attending trucking

15  school when he instead gambled money loaned to him to pay bills.  Petitioner knew that he stood

16  to gain $100,000 in insurance proceeds from Cynthia's death, a fact he shared with at least one

17  friend in the same breath that he indicated his desire to have his wife killed.  He was at home with

18  Cynthia during the likely time that she was killed – as she prepared to depart for work prior to

19  8:30 a.m.  He left shortly thereafter and had time to dispose of his bloody clothes and the murder

20  weapon.

21         Evidence not heard by the jury also supports petitioner's conviction and calls the

22  credibility of his claim of innocence into question.  Petitioner's blood was found on a towel in the

23  washing machine in the kitchen where Cynthia was killed.[9]  Petitioner had cheated on Cynthia

24  and racked up several gambling losses.  He had enlisted Allen Ames to write a letter to Cynthia

25  purporting to be from a lover so that he could falsely accuse her of adultery.

26  _____

27         [9] While petitioner repeatedly emphasizes that no blood spatter was found on his clothing
    and no blood evidence was found in his truck, the evidence at trial made clear that whoever

28  committed the murder cleaned up prior to leaving the scene, as there was no blood leading out of
    the kitchen.

1    In sum, having carefully considered the equivocal new evidence petitioner has provided

2    along with the evidence presented at trial, the court cannot say that it is probable that, with the

3    benefit of the new evidence, no reasonable juror would have voted to find petitioner guilty

4    beyond a reasonable doubt.

5    **VI.    Conclusion and Recommendation**

6    Petitioner fails to clear the "extremely high hurdle" required to consider his untimely

7    petition on the basis of new evidence of innocence.  Accordingly, it is hereby RECOMMENDED

8    that petitioner's request for testing of fingerprint evidence be denied and respondent's August 20,

9    2010 motion to dismiss (ECF No. 19) be granted.

10   These findings and recommendations are submitted to the United States District Judge

11   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

12   after being served with these findings and recommendations, any party may file written

13   objections with the court and serve a copy on all parties.  Such a document should be captioned

14   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

15   shall be served and filed within fourteen days after service of the objections.  Failure to file

16   objections within the specified time may waive the right to appeal the District Court's order.

17   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

18   1991).  In his objections petitioner may address whether a certificate of appealability should issue

19   in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

20   2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

21   final order adverse to the applicant).

22   Dated:  January 19, 2021.

23                                    EDMUND F. BRENNAN
24                                    UNITED STATES MAGISTRATE JUDGE

25

26

27

28

46